**IOWA INDEPENDENT BANKERS, an Iowa Nonprofit Corporation, Petitioner,**

**v.**

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,**

**Northwest Bancorporation, Intervenor.**

**No. 73–1952.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1974.

Decided Feb. 7, 1975.

---

Wayne P. Dordell, St. Paul, Minn., with whom Horace R. Hansen, St. Paul, Minn. and Richard W. Berglund, Des Moines, Iowa, were on the brief for petitioner.

Karen K. Siegel, Atty., Dept. of Justice, with whom Irving Jaffe, Deputy Asst. Atty. Gen. and Robert E. Kopp, Atty., Dept. of Justice, were on the brief for respondent.

Duane W. Krohnke, Minneapolis, Minn., with whom Dorsey D. Ellis, Jr., Iowa City, Iowa, was on the brief for intervenor.

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

Before TAMM and LEVENTHAL, Circuit Judges and MERHIGE,* United States District Judge for the Eastern District of Virginia.

TAMM, Circuit Judge:

Iowa Independent Bankers (Iowa Bankers), an association of over 400 Iowa banks, petitions this court to set aside an order of respondent, Board of Governors of the Federal Reserve System (the Board), approving the acquisition of two Iowa banks by Northwest Bancorporation (Northwest). Petitioner argues principally that the Iowa statute authorizing the acquisition violates the fourteenth amendment to the United States Constitution, conflicts with federal law governing bank holding companies, and violates certain provisions of the Iowa Constitution. We reject petitioner's arguments and deny the petition.

## I. INTRODUCTION

The bank holding company is a popular device for expansion in states that limit or prohibit financial institutions from engaging in branch banking.[1] Since 1956, the federal government has regulated this field through the Bank Holding Company Act of 1956, 12 U.S.C. §§ 1841–1850 (1970). As part of the regulatory scheme, bank holding companies must register with the Board of Governors of the Federal Reserve System and must obtain its approval prior to culminating any acquisitions. 12 U.S.C. § 1842(a). Nevertheless, even after passage of the Act, the states still retained significant responsibility for regulating the banking industry within their borders. In section 1846, Congress reserved to each state "such powers and jurisdiction which it now has or may hereafter have with respect to banks, bank holding companies, and subsidiaries thereof." Of greater importance to this litigation is another limitation placed upon the Board, specifically section 1842(d), which provides that no acquisition of a state bank by an out-of-state bank holding

1. *See* H.R.Rep.No.609, 84th Cong., 1st Sess. 6–7 (1955).

company will be approved unless such an acquisition "is specifically authorized by the statute laws of the State in which such bank [the acquiree] is located, by language to that effect and not merely by implication."

In 1972, the Iowa legislature revised its banking laws, adding several sections regulating bank holding companies, including the following:

Nothing in this division shall be construed to authorize a bank holding company which is with respect to the state of Iowa an "out-of-state bank holding company" . . . to acquire any . . . interest in . . . any bank in this state, unless such bank holding company was on January 1, 1971, registered with the federal reserve board as a bank holding company, and on that date owned at least two banks in this state.

Iowa Code Ann. § 524.1805 (Supp.1974–1975). The legality of this statute is the primary issue in this litigation.

At the time the statute was passed, Northwest was the only out-of-state bank holding company that controlled any banks in Iowa. Within several months of the enactment of section 524.-1805, Northwest arranged to acquire controlling interests in two Iowa banks, Bettendorf Bank and Keokuk Bank, and applied to the Board for approval. The Board invited comments by interested persons, and Iowa Bankers, some of whose members would become competitors of Northwest if approval was granted, raised objections. Iowa Bankers argued that approval could not be granted

because section 524.1805 violated the equal protection clause of the fourteenth amendment to the United States Constitution, and violated the equality, general and uniform, and no exclusive privilege clauses of the Iowa Constitution; consequently, the acquisition of Iowa banks by an out-of-state bank holding company was not expressly authorized by a valid law as required by section 3(d) of the Bank Holding Company Act, 12 U.S.C. § 1842(d).[2] Petitioner also argued that the intent of Congress in passing this section of the Act was to prohibit the states from selectively allowing bank holding company expansion across state lines, and section 1842(d), in fact, prohibited the Iowa legislature from enacting such a statute. Northwest Bancorporation, 38 Fed.Reg. 21531–32 (1973). Finally, Iowa Bankers maintained that the proposed acquisition would have anticompetitive effects. Id. at 21531.

The Board approved the application, finding that the acquisition would not be anticompetitive but would promote competition in the affected area. Id.[3] It also concluded that section 524.1805 did not conflict with the intent of Congress, since 12 U.S.C. § 1846 expressly reserved to the states all power and jurisdiction that they possessed before passage of the Act. Id. at 21532. However, the Board refused to rule on the constitutional objections raised by Iowa Bankers, stating:

As required by *Whitney* [Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386

2. § 1842(d), Limitation by State boundaries.
Notwithstanding any other provision of this section, no application shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside the State in which the operations of such bank holding company's banking subsidiaries were principally conducted on July 1, 1966, or the date on which such company became a bank holding company, whichever is later,

unless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication. For the purposes of this section, the State in which the operations of a bank holding company's subsidiaries are principally conducted is that State in which total deposits of all such banking subsidiaries are largest.

3. Iowa Bankers has not challenged the validity of this finding on appeal.

(1965)] the Board considers the applicability and effect of State legislation, but the constitutional validity thereof is presumed; and objectors' challenges to the constitutionality of the recently-enacted Iowa legislation in this matter are properly cognizable only by the judiciary.

*Id.* (citation omitted).[4]

Dissatisfied with the Board's approval, Iowa Bankers petitions this court to set aside the Board's order. Northwest has intervened on the Board's side.

## II. STANDING

At the threshold, we are confronted by Northwest's contention that petitioner does not have standing to raise the constitutional issues as neither it nor its constituents are members of the class discriminated against. We believe that this argument is untenable, the result of confusing the distinct concepts of standing to sue and standing to assert the rights of others once properly before the court. We hold that petitioner has standing to raise the constitutional issues before this court.

In the first instance, petitioner undeniably has standing to sue. Such standing is conferred upon petitioner statutorily, as 12 U.S.C. § 1848 provides that "[a]ny party aggrieved by an order of the Board" under the Act is entitled to judicial review in this court. Section 1850, added by the 1970 amendments, further defines the class of "parties aggrieved" to include those who are or would become competitors of the applicant if the acquisition was approved. Thus, any bank that competes with the Bettendorf or Keokuk Banks has the right to seek judicial review of the Board's order. Since several of petitioner's member banks compete with the Bettendorf or Keokuk Banks, petitioner is properly be-

fore this court. *See* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

Once properly before this court, the question becomes may petitioner assert in this proceeding the rights of those out-of-state bank holding companies that are allegedly being discriminated against. We think that the Supreme Court's decision in FCC v. Sanders Bros. Radio Station, 309 U.S 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), controls, and requires that we answer this question affirmatively. In *Sanders,* the Court considered a challenge to the standing of a party under section 402(b) of the Communications Act of 1934, 47 U.S.C. § 402(b) (1970), which provides for judicial review by the applicant for a permit or "by any other person aggrieved." Rejecting the contention that since economic injury to a competitor was not a ground for refusing to issue a broadcast license, Sanders, as a competitor, could not seek review of a license grant, the Court stated that:

> Congress had some purpose in enacting § 402(b)(2). It may have been of opinion that one likely to be financially injured by the issue of a license would be the only person having a sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission in granting the license. It is within the power of Congress to confer such standing to prosecute an appeal.

> We hold, therefore, that the respondent had the requisite standing to appeal and to raise, in the court below, any relevant question of law in respect of the order of the Commission.

309 U.S. at 477, 60 S.Ct. at 698 (footnote omitted).

Just as the respondent in *Sanders* could properly seek judicial review of

4. Petitioner in this action has not challenged the validity of the Board's interpretation of its mandate. Since the parties have not briefed this issue and its resolution would not change the outcome of this case, we have decided to leave it open for future determination. However, we feel constrained to register our sub-

stantial doubt that the Board can continue to presume conclusively the constitutional validity of state or federal laws in light of the Supreme Court's opinion in Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965).

"any relevant question of law in respect of the order of the Commission," petitioner here may raise before this court any objection to the Board's decision, including any state and federal constitutional claims. *See* Sierra Club v. Morton, *supra,* 405 U.S. at 736–38, 740 n.15, 92 S.Ct. 1361; Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 14, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); 3 K. Davis, Administrative Law Treatise § 22.07 (1958).

## III. THE MERITS

### A. *Equal Protection*

. Petitioner's first argument is that section 524.1805 of the Iowa Code, set out in Part I, violates the equal protection clause of the fourteenth amendment by creating two classes of out-of-state bank holding companies: one, composed of those out-of-state bank holding companies that control only one Iowa bank or do not control any Iowa banks, cannot acquire banks within Iowa; the other, composed of all out-of-state bank holding companies controlling two or more Iowa banks, may acquire additional Iowa banks. In fact, the only member of the latter class is Northwest, the sole beneficiary of the legislation. Iowa Bankers contends that this situation creates an invidious discrimination prohibited by the equal protection clause.

■ Petitioner recognizes that since the Iowa statute neither creates a suspect classification nor impinges upon fundamental rights, our review is limited to determining whether the statute bears a rational relationship to a legitimate state purpose. *E. g.,* Village of Belle Terre v. Boraas, 416 U.S. 1, 6–8, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); Dandridge v. Williams, 397 U.S. 471, 484–486, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). However, petitioner contends that the statute lacks such a relationship, analogizing the classification to that in Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1

L.Ed.2d 1485 (1957). We cannot accept petitioner's contention, as there is a rational, nondiscriminatory justification for the legislature's action.

■ The initial error in petitioner's reasoning is its incorrect definition of the classes created by the statute. Since there are no out-of-state bank holding companies that control only one Iowa bank, the line actually drawn by the Iowa legislature is between out-of-state bank holding companies that have some pre-existing stake in the Iowa banking system *by virtue of past ownership of in-state banks,* and those out-of-state bank holding companies that do not. We think it is perfectly rational for the Iowa legislature to determine that Northwest, the only out-of-state bank holding company that has a pre-existing stake in the Iowa banking system and has proven itself to be a positive force in the system, should be allowed to compete on the same basis as other Iowa banks, but also to decide that the state would not be well served if out-of-state bank holding companies were allowed wholesale entry into the Iowa market. This was precisely the intent of the Iowa legislature as the following excerpt from a report by the joint legislative committee that drafted the Iowa bank holding company legislation reveals:

One out-of-state bank holding company, Northwest Bancorporation of Minnesota, has owned four banks in Iowa since before 1956. The Study Committee believes the firm has shown itself to be a good citizen of the Iowa business community, and should be allowed the same benefits of state law as the domestic bank holding companies. However, it is not considered desirable to leave the state's banking structure open to entry by outside bank holding companies generally, some of which might be too large and too far-flung to be effectively regulated by the Iowa Department of Banking.[5]

5. Final Report of the Bank Holding Companies Study Committee at 14 (December 8, 1971). The Bank Holding Companies Study Committee was a joint committee established by the Sixty-fourth Iowa General Assembly, First Session, to determine whether revisions in the Iowa banking laws were necessary, and to prepare new legislation. The committee

In short, the legislature intended to allow all pre-existing bank holding companies, whether in-state or out-of-state, to compete on an equal basis, while preventing a new influx of out-of-state bank holding companies into Iowa. We think that this is precisely the type of "grandfathering" that has been repeatedly approved by the Supreme Court. *See, e. g.,* United States v. Maryland Savings-Share Insurance Corp., 400 U.S. 4, 91 S.Ct. 16, 27 L.Ed.2d 4 (1970); Sampere v. New Orleans, 279 U.S. 812, 49 S.Ct. 262, 73 L.Ed. 971 (1929), affg. per curiam, 166 La. 776, 117 So. 827 (1928); Watson v. Maryland, 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 1154 (1910).

That the statute on its face draws the line between those out-of-state bank holding companies with one Iowa bank, and those with two or more is without consequence for equal protection purposes. As mentioned *supra,* all parties concede that at all relevant times, Northwest, which controlled four Iowa banks, was the only out-of-state bank holding company that owned any Iowa banks. As no out-of-state bank holding company owned only one Iowa bank, any discrimination with respect to such bank holding companies is purely hypothetical and without substance. We do not think that the Iowa legislature, dealing as it must with the realities of the Iowa banking structure, must draw its statutes to encompass hypothetical situations that could never bear the fruits of reality.[6] *See* Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). The realities of the situation do not reveal any classification not supported by a rational basis.

We also believe that petitioner's reliance on Morey v. Doud, *supra,* is misplaced. In *Morey,* the Supreme Court invalidated on equal protection grounds an Illinois statute designed to comprehensively regulate the currency exchange business, but which expressly excepted the American Express Company from such regulation. The Court concluded that this named exception from the controls to which other companies were subject could not be rationalized with the Illinois legislature's goal of "continuing" protection for the public, since American Express, though undoubtedly financially secure at the time, might not remain solvent in the future. *Id.* 354 U.S. at 466–467, 77 S.Ct. 1344. Thus, the significance of the case is not, as petitioner maintains, the mere fact that a named recipient was given a privilege that others were not, but rather that the privilege bestowed upon one enterprise among many existing enterprises already competing in the same market was not rationally related to the legislature's purpose.

▪ Although the facts in the case *sub judice* bear a surface relationship to those in *Morey,* when viewed more closely they are quite the opposite. Unlike *Morey,* the legislation here is not designed to bestow a benefit upon one competitor over all others, but merely to allow Northwest to compete on an equal basis with other Iowa banks.[7] We can

held numerous hearings and issued its final report with recommended revisions in the banking law. The committee's proposals concerning bank holding companies were adopted by the Iowa Senate and House with only minor changes not relevant here.

**6.** We note also that the line drawn by the legislature in section 524.1805 is congruent with the Iowa Code definition of a bank holding company, which provides that a bank holding company "means any . . . organization, other than an individual, which directly or indirectly owns or controls . . . two or more banks . . . . Iowa Code Ann. § 524.1801. The Bank Holding Companies Study Committee recommended this defi-

nition, despite the fact that the federal definition had been amended in 1970 to include one-bank holding companies, because of a concern that since many one-bank holding companies could continue to engage in non-banking activities, *see* 12 U.S.C. § 1843(a)(2), they would be difficult to regulate. Final Report of the Bank Holding Companies Study Committee, *supra* at 4, 14.

**7.** The fact that the Iowa statute does not bestow a benefit on one competitor among many existing competitors distinguishes this case from Dukes v. New Orleans, 501 F.2d 706 (5th Cir. 1974) which relied on Morey v. Doud to overturn a city ordinance that gave a monopoly to a hot dog vendor by forcing out

find no violation of the equal protection clause under these circumstances.[8]

### B. The Alleged Conflict between State and Federal Law

■ Petitioner's second argument is based on the premise that section 524.-1805 conflicts with the intent of Congress as embodied in the Douglas amendment to the Bank Holding Company Act. The Douglas amendment, 12 U.S.C. § 1842(d),[9] prohibits bank holding companies from acquiring banks in other states unless such an interstate acquisition is specifically authorized by a law of the acquiree state. Petitioner maintains that implicit in the Douglas amendment is a prohibition against discrimination between out-of-state bank holding companies. In other words, petitioner argues that under section 1842(d), the states can only decide whether to extend the right to acquire in-state banks to all out-of-state bank holding companies or to prohibit such acquisitions entirely.

We note at the outset that nothing in the language of section 1842(d) points to this result, and petitioner has not relied on any statutory language. Moreover, petitioner's reading of section 1842(d) conflicts with section 1846, which reserves to the states all power and jurisdiction in effect before the Act,[10] for there can be no doubt that prior to the passage of the Act, the states were free to regulate in-state bank acquisitions by out-of-state bank holding companies. The only support that petitioner offers for its proposition is two paragraphs of a statement made by Senator Douglas during the Senate floor debate:

> I wish to repeat that, so far as interstate acquisition of banks is concerned, namely, purchase by bank holding companies of banks in other States, the provision in my amendment is in principle almost identical with the present provision which governs branch banking.

> Therefore, it is a logical continuation of the principles of the McFadden Act, which tried to prevent the Federal power from being used to permit national banks to expand across State lines in a way contrary to State policy and, of course, under the McFadden Act, even to expand within a State.

102 Cong.Rec. 6860 (1956). However, whatever support these two paragraphs offer evaporates when the entire statement of Senator Douglas and the statements of other senators involved in the debate are read.[11] Not once in the entire debate is the discrimination question raised. Moreover, in the paragraph immediately before the two cited in petitioner's brief, Senator Douglas seems to anticipate that states might be selective in allowing bank holding companies to cross state lines:

> Even with my amendment, the Federal Reserve Board would still have

an existing competitor through the use of a grandfather clause.

**8.** Petitioner also argues that section 3(d) of the Bank Holding Company Act, 12 U.S.C. § 1842(d), violates the guaranty of equal protection inherent in the fifth amendment due process clause to the extent that the statute authorizes the states to discriminate between bank holding companies. We reject this argument as we find it indistinguishable from a similar argument rejected by the Supreme Court in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Responding to the argument that Congress had authorized a one-year waiting requirement for AFDC benefits that was found to be invidiously discriminatory, the Court stated "[b]ut even if we were to assume, arguendo, that Congress did approve the imposition of a one-year waiting period, it is the responsive state

legislation which infringes constitutional rights. By itself § 402(b) has absolutely no restrictive effect. It is therefore not that statute but only the state requirements pose the constitutional question." Id. at 641, 89 S.Ct. at 1335.

**9.** See note 2, supra.

**10.** § 1846 Reservation of rights to States.

The enactment by the Congress of this chapter shall not be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with respect to banks, bank holding companies, and subsidiaries thereof.

**11.** The significant portions of the Senate debate are found at 102 Cong.Rec. 6750–58, 6854–62 (1956).

final jurisdiction over the acquisition of banks or bank holding companies within a given State, that, is intrastate acquisitions. If and when individual States permitted *a bank holding company* from another State to acquire assets across State lines, then the Federal Reserve Board would have final jurisdiction in those cases as well.

102 Cong.Rec. 6860 (1956) (emphasis added). Lastly, it is obvious even from the quotation that the intent of the Douglas Amendment was to assure that the states had sufficient power to control the expansion of bank holding companies across state lines so that such expansion would not contravene state policy. Petitioner's suggested interpretation of section 1842(d) would rob the states of this power. In short, we think that petitioner has failed to demonstrate that Congress intended to bar discriminations of the sort found in Iowa Code Ann. § 524.-1805. Accordingly, we find no conflict between the Iowa statute and federal statutory law.

### C. *The Iowa Constitutional Issues*

Along with its federal claims, petitioner asserts that section 524.1805 of the Iowa Code contravenes three provisions of the Iowa Constitution: article I, section 6, the "equality" clause; article III, section ·30, the "general and uniform" clause; and article VIII, section 12, the "no exclusive privilege" clause. We find that petitioner's contention lacks merit and hold that section 524.1805 does not offend against the Iowa Constitution. We examine the constitutionality of each provision in turn.

■ Petitioner claims that section 524.1805 contravenes the guaranty of equal treatment to the people of Iowa embodied in article I, section 6.[12] However, petitioner is forced by the overwhelming weight of Iowa case law to admit that "[t]he Iowa Supreme Court has held that these state constitutional

provisions [art. I, sec. 6, art. III, sec. 30] articulate the same principle contained in the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution." Petitioner's Br. at 14. *See, e. g.,* Brown Enterprises, Inc. v. Fulton, Iowa, 192 N.W.2d 773 (1971); State v. Kappos, Iowa, 189 N.W.2d 563, cert. denied and appeal dismissed, 405 U.S. 982, 92 S.Ct. 1242, 31 L.Ed.2d 449 (1971); Becker v. Board of Education, 258 Iowa 277, 138 N.W.2d 909 (1965); Chicago and Northwestern Ry. Co. v. Fachman, 255 Iowa 989, 125 N.W.2d 210 (1963). Thus, its argument rests on the proposition that although the fourteenth amendment protects against the same evils as the equality clause of the state constitution, Iowa applies the equality clause more rigorously. We do not believe, however, that the Iowa cases interpreting the equality clause have placed such a construction on it.

■ Petitioner cites only two cases in support of its interpretation of the equality clause. The first case, Chicago and Northwestern Ry. Co. v. Fachman, *supra,* clearly cannot support petitioner's position, as the Iowa Supreme Court specifically treated the federal equal protection clause and the Iowa equality clause as interchangeable, and rested its decision on both constitutions. *Id.* at 125 N.W.2d 213. Moreover, the reason that the *Fachman* court invalidated the statute—that there was no reasonable basis for its under inclusiveness—suggests nothing more than traditional equal protection analysis. *See id.* at 125 N.W.2d 215. The second case, Sperry & Hutchinson Co. v. Hoegh, 246 Iowa 9, 65 N.W.2d 410 (1954), although basing its holding strictly on article I, section 6 of the Iowa Constitution, has been cited by the Iowa Supreme Court in a later case for the proposition that the Iowa interpretation of its equality clause is the same as the United States Supreme Court's interpretation of the equal pro-

---

**12.** Article I, section 6 provides that:

All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens.

tection clause. Becker v. Board of Education, *supra,* 138 N.W.2d at 912. Furthermore, it is difficult to see how the Iowa Supreme Court's holding in *Sperry & Hutchinson* adds to petitioner's analysis. That case dealt with an Iowa law that forbade the use of trading stamps not redeemed by the merchant that issued them. The court initially opined that regulation of trading stamps was in all probability an improper exercise of the police power. *Id.* at 65 N.W.2d 414–16. Having taken a narrow view of such power, the court concluded that any police power justification for prohibiting trading stamps issued and redeemed by third parties such as *Sperry & Hutchinson* also applied to merchant-redeemed stamps, which were not prohibited, and invalidated the statute as being an arbitrary classification. *Id.* at 416–17. Thus, the case is not a departure from traditional equal protection analysis, since the court merely required a reasonable basis for the classification. The scrutiny seems stricter because of the Iowa Court's narrow view of the police power. However, in the present case no police power issue is evident; clearly the Iowa legislature has the power to regulate the structure of the Iowa banking industry.

■ Finally, petitioner's contention is weakened by its admission that *Fachman* and *Sperry & Hutchinson* stand only for the proposition that there be some reasonable relationship between the classification and a legitimate public purpose. Petitioner's Br. at 17–18. As already indicated in Part III, A, the Iowa legislature could legitimately decide that Northwest, because of its past participation in Iowa banking, should continue to participate but that out-of-state bank holding companies with no prior stake should not. Given this legitimate end, and that the legislation enacted produces exactly this result, we think that petitioner's "equality" clause argument must fall.

Petitioner's second state constitutional argument is that section 524.1805 violates article III, section 30 of the Iowa Constitution. This provision absolutely forbids the passage of so-called special laws in six enumerated cases and then provides that "in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State . . . ." Petitioner contends that since the class created by section 524.1805 is closed and contains only one beneficiary, it is a special law within the meaning of article III, section 30.

■ Since the statute does not fall into the six enumerated classes that absolutely prohibit special laws,[13] petitioner carries the burden of proving that the statute in question is a special law and that a general and uniform law could have been enacted in its place. *See, e. g.,* Dickinson v. Porter, 240 Iowa 393, 35 N.W.2d 66 (1948), appeal dismissed, 338 U.S. 843, 70 S.Ct. 88, 94 L.Ed. 515 (1949). Whether section 524.1805 is a special or general law is a substantial question to which both parties have addressed considerable argument. However, we need not decide this question, for assuming *arguendo* that section 524.1805 is a special law, it is abundantly clear that a general law could not have been substituted.

■ The most recent Iowa case to consider the issue of the applicability of a general law to a specific situation is State Board of Regents v. Lindquist,

---

13. Article III, section 30 states that:

The General Assembly shall not pass local or special laws in the following cases:
(a) For the assessment and collection of taxes for State, County, or road purposes;
(b) For laying out, opening, and working roads or highways;
(c) For changing the names of persons;
(d) For the incorporation of cities and towns;
(e) For vacating roads, town plats, streets, alleys or public squares;
(f) For locating or changing county seats. In all the cases above numerated, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State; . . .

Iowa, 188 N.W.2d 320 (1971), which upheld the validity of a statute that authorized the use of revenue bonds to finance additions to the University of Iowa Hospitals against an attack that included, *inter alia,* the contention that the statute violated article III, section 30. · The court first held that the statute was a special law,[14] and then considered whether a general law could have been made applicable. Setting forth the standard for making this determination, the court stated that "[i]n determining whether a general law can be made applicable, courts consider the nature and purpose of the legislation and conditions and circumstances under which it was enacted." *Id.* at 188 N.W.2d 324. The conclusion reached by the Iowa Supreme Court in *Lindquist* is crucial to the present case, for although the statute dealt only with the hospitals at one university, the court held that:

> The evidence discloses that the schools of higher learning possess but a single major institution like this hospital and that this hospital, which needs enlargement, has peculiar revenue-producing capabilities making revenue bonds feasible. The state has the problem of this particular institution. Mindful of the presumption of validity which attends legislative acts, we believe the legislature was within its province in enacting a statute to deal with this special problem.

*Id.*

In the case *sub judice,* the legislature made a perfectly legitimate decision to preclude out-of-state bank holding companies from acquiring banks in Iowa because of the concern that the state would be unable to regulate them effectively. However, it was faced with the problem of a particular institution, Northwest, which for many years had owned several Iowa banks and had proven to be a positive influence in the Iowa

banking industry. The legislature thus made the decision that Northwest, the only out-of-state bank holding company that exhibited the special characteristic of favorable past participation in the Iowa banking industry, ought to be allowed to compete on the same basis as other Iowa banks. As Northwest was the only institution with this special characteristic, the legislature could not have made applicable a general law that prohibited an influx of out-of-state bank holding companies and simultaneously allowed Northwest renewed access to the Iowa banking market.

Petitioner's last state constitutional argument is that section 524.-1805 violates article VIII, section 12 of the Iowa Constitution, which provides that ". . . no exclusive privileges, except as in this article provided, shall ever be granted." This contention must fail as article VIII, section 12 has never been construed to prohibit the award of exclusive franchises, licenses, or other forms of exclusive agencies. Rather this provision has been construed narrowly to limit only the powers and rights that may be given to a corporation through its charter. Iowa Telephone Co. v. Keokuk, 226 F. 82, 92–94 (S.D.Iowa 1915); Des Moines Street Railroad Co. v. Des Moines Broad-Gauge Street Railway Co., 73 Iowa 513, 33 N.W. 610, 615 (1887). Moreover, petitioner's contention strains the meaning of the term "exclusive." Since Iowa domiciled bank holding companies have the same privilege to acquire banks, the grant to Northwest cannot be considered "exclusive."

In sum, petitioner's state constitutional objections must fail, just as its federal constitutional objections, and for much the same reasons. We are unable to conclude that the Iowa Constitution places greater restrictions upon legislative prerogative than does the federal constitution.[15]

---

14. The Iowa Supreme Court noted that "[i]f the statute dealt with health care facilities at state establishments generally or even at all state schools of higher learning, it would be sufficiently broad in application as to be a general rather than a special law . . . ."

State Board of Regents v. Lindquist, Iowa, 188 N.W.2d 320, 324 (1971).

15. Petitioner also claims that Iowa Code Ann. § 524.1805 does not specifically authorize the acquisition as required by 12 U.S.C. §

## IV. ABSTENTION

Both the Board and Northwest have suggested that this court should abstain from reaching a decision in this case because the statute in question has not been interpreted by the Iowa Supreme Court, nor has that court passed upon the validity of the statute under the state constitution. We considered this issue prior to making a definitive decision on the merits, and concluded that abstention would not be appropriate in this case. However, we thought it advisable to discuss the merits before explaining our reasons for not abstaining because we recognize that a preliminary examination of the issues is necessary to make a reasoned decision on the abstention question.

The nature of our federal system suggests that purely from the standpoint of the locus of decision-making, state courts should always decide issues of state law while federal courts should always adjudicate federal issues. Nevertheless, the realities of the system often find state courts deciding issues of federal law and vice versa. *Cf.* Wisconsin v. Constantineau, 400 U.S. 433, 437–438, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). While Supreme Court review of state court decisions alleviates somewhat the problems presented by adjudication of federal issues in state forums, no such harmonizing influence is generally available with respect to the adjudication of state law in federal forums. The doctrine of abstention is designed to fill this vacuum.

Abstention, however, is not without its costs. As a practical matter, the burden of delay and expense to the parties may be considerable, especially where final resolution of the controversy requires litigation at the appellate level in both federal and state systems. *See* Field, Ab-

stention in Constitutional Cases: The Scope of the *Pullman* Abstention Doctrine, 122 U.Pa.L.Rev. 1071, 1085–86 (1974). Always lurking is the possibility that despite substantial litigation, the parties will return to federal court without an authoritative resolution of the state law issue.[16] Moreover, there is the real possibility that the party who comes into court in an advantageous position may be advocating abstention either to temporarily retain an advantage or to keep it permanently by exhausting his opponent. Another tension is the apparent conflict between abstention, which burdens the plaintiff by forcing him to litigate his state and federal claims in two separate forums, and pendant jurisdiction, which gives the plaintiff a choice of a federal forum for his federal claims without abandoning related state law claims. *See* United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

 Because of the burden placed upon the parties, the Supreme Court has confined the discretion of federal courts to abstain within narrow limits. Time and again, the Supreme Court has pointed out that abstention is proper only where "special circumstances" are present. *See, e. g.,* Lake · Carriers' Assn. v. MacMullen, 406 U.S. 498, 509, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972), and cases cited therein. Perhaps the broadest formulation of the circumstances within which abstention is proper is found in Chief Justice Warren's opinion in Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965). Speaking for an eight member majority, Chief Justice Warren wrote that:

> Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the de-

---

1842(d). This argument is frivolous in light of the legislative history and an admission in Petitioner's Br. at 6 that Northwest "has also acknowledged that the Legislature was aware that the proviso (the last part of Iowa Code Ann. § 524.1805) was for the specific benefit of only Northwest."

**16.** For example, in the case *sub judice*, there is some question whether petitioner has

standing in Iowa state court to litigate the state constitutional issues, since neither it nor its members are within the class allegedly discriminated against. *See* Green v. Shama, Iowa, 217 N.W.2d 547, 556 (1974); Mid-America Pipeline Co. v. Iowa State Commerce Comm'n, 255 Iowa 1304, 125 N.W.2d 801, 803–04 (1964).

termination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication. The doctrine, however, contemplates that deference to state court adjudication only be made where the issue of state law is uncertain.

380 U.S. at 534, 85 S.Ct. at 1182 (citation omitted). From this analysis, we distill a two-fold test as a guide on making our decision. First, a federal court should only abstain where some important value unrelated to the precedential weight of the forum is involved; it is improper to abstain merely because state court pronouncements on state law issues are authoritative or because state courts are more familiar with state law. Second, state law must be sufficiently unclear that a substantial likelihood exists that a state court resolution of the state law issues will forward the goal that the abstention was meant to achieve. We think that this test explains the result reached by the Supreme Court in so-called *Pullman* type abstention cases, referring to the doctrine articulated in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *See, e. g.*, Lake Carriers' Assn. v. MacMullen, *supra*, 406 U.S. at 510–512, 92 S.Ct. 1749, 32 L.Ed.2d 257 (abstention); Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971) (abstention); Wisconsin v. Constantineau, *supra* (no abstention); Fornaris v. Ridge Tool Co., 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970) (no abstention); Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970) (abstention); Harman v. Forssenius, *supra*, 380 U.S. at 533–537, 85 S.Ct. 1177 (no abstention); Davis v. Mann, 377 U.S. 678, 690–691, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964) (no abstention); Meridian v. Southern Bell Telephone & Telegraph Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959) (abstention).

The case before us does not even remotely meet these criteria. By up-

holding the state program against constitutional attack, we have not created the irritant in federal-state relations caused when a federal court either overturns on federal grounds a program that might be so tailored by the state court that it could pass federal scrutiny, or invalidates on state grounds such a program and the state court later upholds it against challenges of a similar nature. There is no interference with important functions peculiarly within the province of the state such as in Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Unlike the plaintiff in *Burford*, petitioner here does not seek to "short circuit" a complex state administrative scheme; instead it is following a statutory scheme which mandates that there will be a federal assessment of the acquisition although state approval is also required. *See* 12 U.S.C. § 1842.

While some might argue that we are making a tentative decision on state law, we do not think that our decision is tentative within the meaning of the abstention doctrine. As will be discussed below, the state statute is clear and unambiguous, and there is ample legislative history to guide our interpretation. While the Iowa courts have not ruled on the validity of section 524.1805 under the Iowa Constitution, each provision relied on by the parties has a long history of consistent interpretation. We believe that before a federal court should abstain from making a "tentative" decision on state law, the chances of an erroneous interpretation must be great. Otherwise abstention would always be required on this ground. Obviously, the greater the history of consistent past interpretation, the less likely a federal court would be erroneous in its ruling.

Lastly, abstention to avoid a constitutional decision would not be profitable in this case. Often avoiding such a decision is not an end in itself, but is utilized as a means, such as to lessen federal-state tensions. However, as we stated earlier, there is no particular tension involved in our decision as we would uphold the statute against constitutional attack. Avoiding a constitutional decision ap-

pears to be an end in itself only where the issue is a particularly sensitive one, or is a decision that the court believes may have serious and perhaps unforeseeable repercussions. Our decision here is neither sensitive nor likely to have serious repercussions. It is merely one in a long line of cases upholding against equal protection attack state economic regulatory statutes as having a rational basis.

Even if there were some significant interest supporting abstention, we do not believe that the second part of our test is met, that the issues of state law be uncertain. All the parties agree that the purpose behind the statute was to allow Northwest to acquire banks as if it was an Iowa bank holding company instead of an out-of-state one. Hence, the uncertainty, if it exists at all, exists in the constitutional provisions. However, while the validity of section 524.1805 has never been considered by the Iowa Supreme Court, we believe that the Iowa court has ruled on the relevant provisions of the Iowa Constitution so often as to define their scope with certainty. In the words of Chief Justice Warren:

> If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction.

Harman v. Forssenius, *supra*, 380 U.S. at 534–535, 85 S.Ct. at 1182. As demonstrated in part III of this opinion, the Iowa Constitutional issues are insubstantial and would not "render unnecessary or substantially modify the federal constitutional question." We therefore find it unnecessary to abstain.

Appellants and Northwest rely heavily on Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970) to support their contention that abstention is called for in this case. While there are certain similarities between the two cases, a careful analysis reveals why *Reetz* was an appropriate case for abstention and the present case is not. In *Reetz*, a three-judge federal court declared that certain Alaska statutes and regulations thereunder concerning salmon net-gear licenses for commercial fishermen violated the equal protection clause. In so doing, the three-judge court did not consider the plaintiff's claims of invalidity under two provisions of the state constitution, both of which had never been interpreted by the Alaska Supreme Court. The United States Supreme Court reversed, holding that abstention was appropriate because of the presence of special circumstances. *Id.* at 86–87, 90 S.Ct. 788. The Court initially observed that a decision invalidating the program could be a federal-state irritant and noted that the constitutional provisions in question involved fishing, "an asset unique in its abundance in Alaska . . . the management of which is a matter of great state concern." The Court then recognized the uncertainty in the state constitutional law, concluding that the state court should be the first institution to put a judicial gloss on these never interpreted provisions. Moreover, the Court had noted earlier in the opinion that "[a] state court decision . . . could conceivably avoid any decision under the Fourteenth Amendment and would avoid any possible irritant in the federal-state relationship." Thus, unlike the case *sub judice* there was ample reason to abstain in *Reetz*. It is the lack of the very attributes that made abstention appropriate in *Reetz* that makes abstention inappropriate here.

## V. CONCLUSION

Having concluded that we cannot abstain, but must decide the state and federal issues raised in this appeal, we hold, for the reasons stated in part III of this opinion, that the petition must be

Denied.