**NORTHWESTERN BELL TELEPHONE COMPANY, Appellant,**

v.

**IOWA UTILITIES BOARD, Appellee,**

**Iowa Network Services, Inc.; MCI Telecommunications Corp.; Office of Consumer Advocate; AT & T Communications of the Midwest, Inc.; and Teleconnect Long Distance Services and Systems Company; Intervenors–Appellees.**

**No. 90–97.**

Supreme Court of Iowa.

Nov. 20, 1991.

William K. Schaphorst, Gen. Counsel, Northwestern Bell Telephone Co., Des Moines, and James Gallagher of Maun & Simon, St. Paul, Minn., for Northwestern Bell.

Susan Allender, Gen. Counsel, Allan Kniep, Asst. Gen. Counsel, and Diane Munns, Deputy Gen. Counsel, for Iowa Utilities Bd.

Michael P. Joynt and John T. Ward of Wasker, Sullivan & Ward, Des Moines, and Ellen S. Deutsch, Philip J. Mause, and Robert C. Lopardo of Thelen, Marrin, Johnson & Bridges, Washington, D.C., for Iowa Network Services.

James R. Maret, Consumer Advocate, and David R. Conn and Alice J. Hyde, for Office of Consumer Advocate.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

The appellant, Northwestern Bell Telephone Company, seeks review of an Iowa Utilities Board (the board) decision approving the establishment, by Iowa Network Services (INS), of a fiber-optic network and modern switching system that will concentrate the long-distance traffic to and from 135 independent, rural Iowa telephone companies. Specifically, Northwestern Bell (NWB) objects to the exclusive use of the system to terminate all long-distance calls destined for customers of the participating telephone companies (hereinafter referred to as PTC's). The district court affirmed the board's decision, and we affirm the district court.

Prior to discussing the facts unique to this dispute, a general description of the provision of long-distance telephone services is in order. A long-distance call is initiated when a caller, or "end user," conveys the number of the desired recipient to their "local exchange utility." See Iowa Admin.Code 199.22.1(3) ("Local exchange utility means a telephone utility that provides local service under tariff filed with the board. The utility may also provide other services and facilities such as access services."). The PTC's described above own and operate 275 local exchange utilities across Iowa. A connection must then be made between the originating local exchange and a long-distance carrier or "interexchange utility." See Iowa Admin.Code 199.22.1(3) ("Interexchange utility means a utility, a resale carrier or other entity that provides intrastate telecommunications services and facilities between exchanges within Iowa, without regard to how such traffic is carried. A local exchange utility that provides exchange service may also be considered an interexchange utility."). The above sequence of connections and communications is known as "intrastate access service." See Iowa Admin.Code 199.22.1(3) ("Intrastate access services are services of telephone utilities which provide the capability to deliver intrastate telecommunications services which originate from end-users to interexchange utilities and the capability to deliver intrastate telecommunications services from interexchange utilities to end-users."). After the provision of originating access service, the interexchange carrier conveys the call to the local exchange of the intended recipient of the call; this service is quite appropriately defined as "interexchange service." See Iowa Admin.Code 199.22.1(3) ("Interexchange service is the provision of intrastate telecommunications services and facilities between local exchanges...."). Once the call reaches the terminating exchange, terminating access service must be provided to enable receipt of the call by the intended recipient. As is the case with originating access, terminating access service is defined to include all the connections and communications that the local exchange must either make or contract for to enable receipt of the call by the intended recipient or terminating "end user."

A specialized form of originating access service, known as "equal access," enables the caller to predesignate a given interexchange utility as their desired long-distance carrier. Under the equal-access system, this predesignated carrier is accessed merely by dialing one plus the area code plus the seven-digit number or just one plus the recipient's seven-digit number. In the absence of equal access, the caller has no choice as to the interexchange carrier when using "one-plus" dialing; all one-plus long-distance calls are automatically handled by a single interexchange carrier. In this lat-

ter situation, the only means of accessing an alternative interexchange carrier is by dialing a special, multidigit access code in addition to the desired seven or ten-digit number.

The INS system now in operation is designed to enable the PTC's to offer their customers equal-access service accessing. Prior to the inception of INS's centralized accessing system, the PTC's had to rely on other relatively larger, local phone companies, such as NWB, to assist them in the provision of accessing services. Because the accessing services were not of the equal-access type, the caller had no choice as to their interexchange carrier when making one-plus long-distance calls. Moreover, since NWB is an interexchange utility as well as a purveyor of access services, NWB enjoyed a de facto monopoly in the realm of one-plus, intra-LATA[1] long-distance calling. Thus, the INS network will not only replace NWB as a purveyor of access services with respect to the PTC's, but it will introduce a measure of competition into the one-plus, intra-LATA long-distance market.

Equal access was apparently not forthcoming to these smaller accessing facilities because the competing interexchange carriers who could have instituted an equal-access system concluded that it would not be economically feasible given the thinness of the market within any given PTC. As a consequence, INS initiated its plan to collectivize the accessing needs of the various independent phone companies by providing a centralized, equal-access network with a single switching unit located in Des Moines. The INS network is designed to foster competition among interexchange carriers in the one-plus long-distance market by making it economically feasible for long-distance carriers to absorb the costs of the more sophisticated, equal-access switching system. The network will also offer "modern information systems" to the PTC's, another feature formerly unavailable because of the thinness of the market in any single independent, local telephone company prior to the INS collectivization.

Since providing telephonic access service is a communications service subject to the jurisdiction of the Iowa Utilities Board, INS was required to initiate tariff proceedings before the board prior to implementing its accessing network. *See* Iowa Code § 476.1 (1991) (authorizing the board to regulate rates and services of utilities providing communication services). The board approved INS's plan for a centralized, equal-access network and the associated rate structure. Under the INS system, the PTC's will be allowed to enter into five-year contracts with INS. These contracts will grant INS the exclusive right to provide accessing services for long-distance calls originating as well as those terminating within the PTC's. As a result, NWB's role with respect to the PTC's will be limited to providing intra-LATA long-distance services should NWB elect to do so. NWB will not be permitted to maintain any direct connections with the PTC's; all connections, if NWB elects to provide intra-LATA long-distance services, must be made at the INS switch in Des Moines.

Because NWB supplied access services and one-plus intra-LATA long-distance services for the various PTC's prior to the advent of the INS network, NWB presently has a system in place that would enable it to provide terminating access to the PTC's. NWB contends that, notwithstanding the board-sanctioned accessing agreements freely entered into between INS and the PTC's, it should be permitted to provide terminating access service to the PTC's in competition with the INS network. NWB offers five arguments in support of their position.

---

1. As a result of the antitrust decree applicable to AT & T and the Bell Operating Companies, including NWB, the United States has been divided into LATA's (local access transport areas). *See United States v. AT & T,* 552 F.Supp. 131 (D.D.C.1982), *aff'd,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Accordingly, long-distance telephone services have been divided into *intra*-LATA interexchange services and *inter*-LATA interexchange services depending upon whether the long-distance calls originate and terminate within the same LATA. The AT & T antitrust decree prohibits NWB from providing *inter*-LATA interexchange services but permits the provision of *intra*-LATA long-distance services.

First, NWB contends that the board's approval of the INS network is in excess of the board's statutory authority. Second, it is argued that the agency's decision is arbitrary and capricious and not supported by substantial evidence. Third, NWB maintains that the board's decision is violative of the state and federal antitrust laws. In a similar argument, it is asserted that approval of INS's system contravenes article VIII, section twelve, of the Iowa Constitution, which provides that no exclusive privileges shall ever be granted to a corporation by the legislature. Finally, NWB argues that the board's action with respect to INS interferes with the lawful managerial authority of NWB.

### I. Standard of Review.

As a general principal, "[i]n the highly technical field of public utility rate regulation, it is proper, even necessary, to grant considerable deference to the expertise of the board." *Consumer Advocate v. Iowa Utils. Bd.*, 454 N.W.2d 883, 885 (Iowa 1990). As a consequence, "nearly all disputes are won or lost at the agency level." *Iowa–Illinois Gas & Elec. Co. v. Iowa State Commerce Comm'n*, 412 N.W.2d 600, 604 (Iowa 1987). Moreover, when reviewing an agency decision, the court is limited to a consideration of the grounds of error assigned under Iowa Code section 17A.19(8) (1991). *Northwestern Bell Tel. Co. v. Iowa State Commerce Comm'n*, 419 N.W.2d 712, 714 (Iowa 1988).

Iowa Code section 17A.19(8)(b) calls upon the reviewing court to reverse an agency action that is in excess of the statutory authority of the agency. An administrative agency has only such jurisdiction and authority as expressly conferred by statute or necessarily inferred from the power expressly granted. *Iowa Power & Light Co. v. Iowa State Commerce Comm'n*, 410 N.W.2d 236, 240 (Iowa 1987). An agency action beyond the statutory authority of the agency is an error of law that should be corrected by the court on judicial review. *Schmidt v. Iowa State Bd. of Dental Examiners*, 423 N.W.2d 19, 21 (Iowa 1988).

Pursuant to Iowa Code section 17A.19(8)(g), a reviewing court must reverse an agency action that is unreasonable, arbitrary or capricious. "Unreasonableness is defined as action in the face of evidence to which there is no room for difference of opinion among reasonable minds or action not based upon substantial evidence.... [However,] [t]he agency is free to exercise its expertise within a reasonable range of informed discretion." *Office of Consumer Advocate v. Iowa State Commerce Comm'n*, 419 N.W.2d 373, 374 (Iowa 1988). "Arbitrary and capricious are practically synonymous; both refer to agency action taken without regard to law or the facts of the case." *Office of Consumer Advocate v. Iowa State Commerce Comm'n*, 432 N.W.2d 148, 154 (Iowa 1988). In short, an agency decision that bears a reasonable relationship to the law and the evidence satisfies the requirements of Iowa Code section 17A.19(8)(g).

Similarly, Iowa Code section 17A.19(8)(f) provides that an agency action shall be reversed if it is unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole; review is not de novo. *Hussein v. Tama Meat Packing Corp.*, 394 N.W.2d 340, 341 (Iowa 1986). "Evidence is substantial if a reasonable person would find it adequate for reaching a conclusion even though a reviewing court might reach a contrary inference." *Mercy Health Center v. State Health Facilities Council*, 360 N.W.2d 808, 811–12 (Iowa 1985). The mere possibility that the record might support another conclusion does not permit the reviewing court to make a finding inconsistent with the agency finding so long as there is substantial evidence to support it. *City of Davenport v. PERB*, 264 N.W.2d 307, 311 (Iowa 1978).

Finally, agency action that is affected by an error of law or violative of constitutional or statutory provisions is also subject to reversal. Iowa Code § 17A.19(8)(a), (e). Thus, to the extent that the board's decision regarding the INS network violates either the state constitution or the antitrust laws, reversal would be in order.

## II. *Agency Authority.*

NWB first contends that the board was without authority to approve the INS accessing network. In particular, NWB argues that allowing the PTC's to enter into contracts with INS for the exclusive provision of terminating access services exceeds the authority of the board under Iowa Code chapter 476 (1991). NWB maintains that the board was limited to approving an accessing network that would exist as a competitor of NWB; under NWB's scenario, the PTC's would have to offer connections to NWB as well as INS so as to facilitate competition in the provision of terminating access services. We do not find the board's authority to be so limited.

Like the district court, we find *Northwestern Bell Telephone Co. v. Hawkeye State Telephone Co.*, 165 N.W.2d 771 (Iowa 1969), to be dispositive of this matter. In *Hawkeye State*, two neighboring telephone exchanges, each utilizing NWB as their interexchange carrier, sought board approval for a system of lines connecting the two exchanges. Under the proposed change, NWB would be limited to making connections at only one of the two local exchanges. NWB objected on the ground that the new system of lines would render useless its own long-distance connections between the two towns and insisted on maintaining direct connections with each exchange. We held that the utilities board had the authority to resolve the dispute and thereby determine the proper point of connection between the local exchanges and NWB. *Id.* at 775.

Our decision in *Hawkeye State* rested upon an interpretation of the predecessors to Iowa Code sections 476.1 and 476.11, both of which delimit the board's regulatory authority. Iowa Code section 476.1, titled "applicability of authority," states that "[t]he utilities board ... shall regulate the rates and *services* of public utilities in the manner hereinafter provided." *Id.* (emphasis added). Iowa Code section 476.11 provides that:

> Whenever toll connection between the lines or facilities of two or more telephone companies has been made, or is demanded under the statutes of this state and the companies concerned cannot agree as to the terms and procedures under which toll communications shall be interchanged, the board upon complaint in writing, after hearing had upon reasonable notice, shall determine such terms and procedures.

*Id.*

■ Couching our holding in *Hawkeye State* in statutory terminology, the point of connection between a local exchange and an interexchange utility is a "service" as defined in section 476.1 as well as a "term and procedure" of the toll connection as described in section 476.11. Consequently, the board is acting within the scope of its authority when it determines the appropriate point of interconnection between a local exchange and an interexchange utility. Board determinations of this type will inevitably have the collateral effect of deciding the extent to which a local exchange can provide communication services that, although denominated as "intrastate access services," are functionally indistinguishable from communication services formerly provided by the interexchange utility in the course of providing "interexchange services."

■ We find NWB's position in the dispute at hand to be indistinguishable from the position it took in *Hawkeye State*. With respect to the issue of statutory authority, the instant case is simply a recreation of the *Hawkeye State* dispute, albeit on a larger scale. In essence, NWB is again challenging the board's authority to classify a telecommunications service— here the INS network—as an accessing service rather than an interexchange service, the latter being an arena in which NWB is clearly entitled to participate. The board's decision that NWB must make all connections with the PTC's at the INS switch in Des Moines effectively categorizes the INS system as part of the regulated, noncompetitive accessing market as opposed to the unregulated, competitive interexchange market. In accordance with our holding in *Hawkeye State*, we must again conclude that the board is clearly autho-

rized to make such a decision under Iowa Code sections 476.1 and 476.11.

### III. Arbitrary and Capricious—Substantial Evidence.

NWB next contends that the board's approval of the INS centralized accessing system was arbitrary, capricious and unreasonable. In particular, NWB questions the reasonableness of allowing the PTC's to agree to secure all their terminating access from the INS system. As noted above, our posture as a reviewing court is to defer to agency action, especially in highly technical areas, so long as the agency has acted "within a zone of reasonableness." *Office of Consumer Advocate v. Iowa State Commerce Comm'n*, 432 N.W.2d 148, 152 (Iowa 1988); *see also* Iowa Code §§ 476.4, 476.6 (1991) (requiring public utilities to file tariffs with the board and predicating board approval on a finding that the rates, charges, schedules and regulations of the utility are just and reasonable).

■ Our review of the justifications offered by the board for its INS ruling lead us to conclude that the decision was eminently reasonable. The board first observed that the INS network is capable of providing bidirectional accessing services since the same lines and switch are used for both terminating and originating access. Given this structure as a fixed cost of operation, the board reasoned that, unless INS provided terminating access as well as originating access, all of the costs of operating the network would have to be recovered in the provision of originating access only. Such a result would frustrate one of the main goals of the INS system since the higher costs, which would be passed along to the interexchange utilities, would deter the entry of competition into the one-plus long-distance market. The board also noted that, if INS were not the exclusive provider of terminating access for the PTC's, this might jeopardize FCC approval of the INS network by materially affecting the ratio of interstate to intrastate usage of the system. In light of the foregoing rationales, it is not plausible to characterize the INS decision as unreasonable.

■ NWB also argues that the board's decision regarding the creation of the INS network is unsupported by substantial evidence as is required by Iowa Code section 17A.19(8)(f). Keeping in mind that substantial evidence is that which a reasonable mind would accept as adequate to reach a given conclusion, *City of Davenport v. PERB*, 264 N.W.2d 307, 311 (Iowa 1978), this argument must fail. After reviewing the testimonial record compiled before the agency, we conclude that the board's rationales for allowing INS to enter into exclusive contracts with the PTC's for the provision of terminating access is adequately supported by the evidence.

### IV. State and Federal Antitrust.

■ NWB maintains that the board's approval of the INS network and its associated exclusive agreements for the provision of terminating access violates sections one and two of the Sherman Act[2] as well as Iowa Code sections 553.4, and 553.5 (1991).[3] These companion state and federal antitrust provisions, in general, prohibit restraints of trade and monopolies. We agree with the district court that the issue of whether the board's ruling created a

---

**2.** Section 1 provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1991).

Section 2 provides in pertinent part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2 (1991).

**3.** Section 553.4 provides that: "A contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Iowa Code § 553.4 (1991).

Section 553.5 provides that: "A person shall not attempt to establish or establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing, or maintaining prices." Iowa Code § 553.5 (1991).

monopoly need not be decided since the state action exemption to the antitrust regime is applicable to the instant situation.

■ Although "[t]he basic premise of the antitrust law is that the market should both direct and constrain private behavior, ... [t]he existence of a state action exemption enables the states ... to define areas inappropriate for market control." P. Areeda and D. Turner, *Antitrust Law* ¶ 213, at 73 (1978). In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the United States Supreme Court first recognized the existence of the state action exemption, noting that it is grounded in the Sherman Act's statutory history and considerations of federalism. *Id.* at 350–51, 63 S.Ct. at 313, 87 L.Ed. at 325–26; P. Areeda & D. Turner, ¶ 211, at 68. The modern formulation of the doctrine is articulated in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), which established two criteria for antitrust immunity. "First, the challenged restraint must be one 'clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the state itself." *Id.* at 105, 100 S.Ct. at 943, 63 L.Ed.2d at 243. In addition, state agencies, such as the Utilities Board, are not regarded as "the state" for purposes of applying the first of the two above criteria. *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 62–63, 105 S.Ct. 1721, 1729–30, 85 L.Ed.2d 36, 48–49 (1985) (policy must be approved or authorized by a body such as the state legislature or state supreme court). As a consequence, actions undertaken by the board are not ipso facto "state policies" under the state action analysis.

The first prong of the state action exemption requires a showing that "the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure." *Southern Motor*, 471 U.S. at 64, 105 S.Ct. at 1730, 85 L.Ed.2d at 49–50. In accordance with our interpretations of Iowa Code sections 476.1 and 476.11, it is clear that the legislature has committed the regulation of accessing services to the Utilities Board. The board has been delegated the authority to dictate the point of connection between the local exchange and the interexchange utility and thereby effectively define which portion of a long-distance call will come under the rubric of "intrastate access services." We, therefore, conclude that the alleged monopoly created by the INS system was approved pursuant to a "clearly articulated and affirmatively expressed state policy."

It should also be noted that the legislative decision to displace competition in the accessing market with a regulatory structure seems prudent given the natural monopoly character of this market. That is, it appears as if demand is "too thin relative to the minimum efficient scale" of an equal-access network to support more than one network. *See* P. Areeda & D. Turner, ¶ 621, at 48. This is evidenced by the failure of equal-access to reach the PTC exchanges individually prior to their collectivization in the INS network; the natural monopoly character is also evidenced in the board's conclusion that unless INS is allowed to handle terminating as well as originating access, the costs would be too high to foster competition in the one-plus long-distance carrier market. In short, monopoly seems inevitable in the equal-access accessing market, and the legislative grant of regulatory authority to the board is consistent with that inevitability. *See* P. Areeda & D. Turner, ¶ 621, at 47.

"The key question [under the second prong of the *Midcal* test] is whether the operative decisions about the challenged conduct are made by public authorities or by the private parties themselves." P. Areeda & D. Turner, ¶ 213, at 73. The regulatory framework embodied in chapter 476 of the Iowa Code provides for a public authority, the Utilities Board, to make or approve all "operative" decisions concerning the INS network. For example, INS is required to file tariffs detailing the rates and charges as well as the rules and regulations under which accessing services are to be provided. Iowa Code § 476.4 (1991). In addition, these tariffs as well as any subsequent rate increases are subject to board approval. Iowa Code §§ 476.3,

476.4, 476.6. Finally, the board's decisions are subject to review by the judiciary as outlined in Iowa Code section 17A.19. The second prong of the *Midcal* test is therefore satisfied.

We have stated that a determination that a given activity is exempt under the federal state action analysis is entitled to "considerable weight" in deciding whether the same activity is exempt from state antitrust regulations pursuant to Iowa Code section 553.6(4). *Neyens v. Roth*, 326 N.W.2d 294, 298 (Iowa 1982). Accordingly, we conclude that the board's decision and the INS network are exempt from the state as well as the federal antitrust regime.

### V. Article VIII, Section Twelve, of the Iowa Constitution.

■ Article VIII, which addresses the creation and regulation of corporations, provides, in pertinent part, that "no exclusive privileges, except as in this article provided, shall ever be granted." Iowa Const. art. VIII, § 12. NWB asserts that this provision precludes the board from approving the INS plan for the negotiation of exclusive agreements with the PTC's for the provision of terminating access. We do not agree.

Article VIII, section twelve, only pertains to rights and powers that may be given to a corporation through its charter. *Des Moines St. R.R. v. Des Moines Broad Gauge Ry.*, 73 Iowa 513, 523, 33 N.W. 610, 615 (1887). The Iowa federal district court followed our *Broad Gauge* case in concluding that the constitutional provision relates solely to the powers of a corporation as distinguished from its property rights. *Iowa Tel. Co. v. City of Keokuk*, 226 F. 82, 92–95 (S.D.Iowa 1915). Also in *Iowa Independent Bankers v. Board of Governors*, 511 F.2d 1288, 1299 (D.C.Cir.1975), the court answered the argument that an Iowa statute authorizing the acquisition of banks by an out of state holding company violated section 12 in the following manner:

This contention must fail as article VIII, section 12 has never been construed to prohibit the award of exclusive franchises, licenses, or other forms of exclusive agencies. Rather, this provision has been construed narrowly to limit only the powers and rights that may be given to a corporation through its charter.

*Iowa Indep. Bankers*, 511 F.2d at 1299.

■ In addition, exclusive operating rights may be conferred upon any person or corporation so long as the grant does not exceed "a reasonable length of time." *State v. Des Moines City Ry. Co.*, 159 Iowa 259, 285–86, 140 N.W. 437, 448 (1913). In the present dispute, the INS contracts with the PTC's are for five years each; we do not deem this to be an unreasonable period. This conclusion is fully consistent with *State v. Santee*, 111 Iowa 1, 82 N.W. 445 (1900), in which we held that granting exclusive operating rights to a particular lantern manufacturer would be violative of the Iowa Constitution. *Id.* at 5, 82 N.W. at 447. In *Santee*, we distinguished those situations in which the "grantee" must seek governmental permission prior to engaging in the activity in question. *Id.* Since the provision of telephonic accessing services clearly requires prior governmental approval, the *Santee* holding does not govern the present dispute.

In short, contract rights, such as those giving INS a five-year exclusive right to provide terminating access for the PTC's, do not come within the purview of section twelve. *Broad Gauge*, 73 Iowa at 523, 33 N.W. at 615. Given that the board has merely sanctioned the creation of a temporally limited contractual relationship between INS and the PTC's, article VIII, section twelve, does not prohibit the board's action here reviewed.

### VI. Interference with the Management of NWB.

■ Insofar as we have already concluded that the authority to render a decision on the issue of exclusive, terminating access agreements rests with the board, it follows that board action taken pursuant to this legislative grant of authority cannot be deemed an interference with the management of NWB. Had the board committed the decision concerning the provision of

terminating access to the management of NWB, this would have constituted an abdication of its authority under Iowa Code sections 476.1 and 476.11.

We have considered the cases offered by NWB in support of their contention that the board's action unlawfully interferes with NWB's managerial prerogative and find them not to be in point. One line of cases involves rate disputes in which the utilities challenged regulatory orders disallowing pass through of expenses already incurred. *See, e.g., Skeedee Indep. Tel. Co. v. Farm Bureau,* 166 Neb. 49, 87 N.W.2d 715 (1958); *Application of Northwestern Bell Tel. Co.,* 78 S.D. 15, 98 N.W.2d 170 (1959). The other line of cases confronts extra-jurisdictional acts by the regulatory body in question. *See, e.g., Pacific Tel. & Tel. Co. v. Public Util. Comm'n,* 34 Cal.2d 822, 215 P.2d 441 (1950); *Missouri v. Missouri Pub. Serv. Comm'n,* 343 S.W.2d 177 (Mo.Ct.App.1960). Neither line of cases is relevant to the instant dispute.

Having concluded that the board's approval of the agreements between INS and the PTC's for the exclusive provision of terminating access services was properly granted and not violative of either antitrust law or the Iowa Constitution, the district court's ruling is affirmed.

AFFIRMED.