**CONFERENCE OF STATE BANK SUPERVISORS, Robert Abrams, Attorney General of the State of New York, et al., Appellants,**

v.

**C.T. CONOVER, Comptroller of the Currency of the United States.**

No. 81–2256.

United States Court of Appeals, District of Columbia Circuit.

Argued June 2, 1982.

Decided Aug. 9, 1983.

Arthur E. Wilmarth, Jr., Washington, D.C., with whom James F. Bell, Washington, D.C., for Conference of State Bank Supervisors, Corinne J. Gieseke, Sp. Asst. Atty. Gen., State of Ill., Chicago, Ill., for People of the State of Illinois ex rel. William C. Harris, Howard L. Zwickel, Asst. Atty. Gen., State of New York, for Robert Abrams, Atty. Gen. of the State of New York, New York City, and William L. Williams, Asst. Atty. Gen., State of Wash., Olympia, Wash., for State of Washington ex rel. Michael D. Edwards, were on brief for appellants.

R. Craig Lawrence, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and Whitney Adams, Asst. U.S. Attys., and Ronald R. Glancz, and L. Robert Griffin, Washington, D.C., were on brief for appellee.

Leonard J. Theberge for Chicago Ass'n of Commerce and Industry, Illinois Bankers Ass'n, Independent Community Banks in Illinois, and Mid-America Legal Foundation, Washington, D.C., were on brief for amici curiae, urging reversal.

Before TAMM, Circuit Judge, ROBB, Senior Circuit Judge, and FAIRCHILD,[*] Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Senior Circuit Judge ROBB.

ROBB, Senior Circuit Judge:

The appellants [1] are state officials responsible for regulation of state-licensed banking institutions. As plaintiffs in the District Court they sued for declaratory and injunctive relief, challenging regulations 12 C.F.R. §§ 28.2(b)-(d), 28.3, & 28.4 (1980) and a portion of an accompanying interpretative statement (44 Fed.Reg. 65381–87 (1979)) adopted by the Comptroller of the Currency pursuant to the International Banking Act of 1978 (IBA). 12 U.S.C. §§ 3101–3108 (Supp. V 1981). Appellants contended that the regulations and statement conflicted with the IBA because they permitted a foreign bank to establish and operate offices where prohibited by state law. In an unreported opinion the District Court granted summary judgment in favor of the Comptroller. *Conference of State Bank Supervisors v. Heimann,* No. 80–3284 (D.D.C. Sept. 30, 1981); Joint Appendix (J.A.) 96–109.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (Supp. V 1981).

1. Conference of State Bank Supervisors; Robert Abrams, Attorney General of the State of New York; State of Washington *ex rel.* Michael D. Edwards, State Supervisor of Banking; People of the State of Illinois *ex rel.* William C. Harris, Commissioner of Banks and Trust Companies.

## I

To engage in the banking business in the United States, a domestic bank may be chartered under state law, subject to the exclusive regulation of the state, or it can operate under a federal charter subject to federal law that in part defers to state law.[2] Prior to the adoption of the IBA a bank organized under the laws of a foreign country could obtain a charter from a state authority only; the federal government did not charter foreign banks. H.R.Rep. No. 910, 95th Cong., 2d Sess. 5 (1978) [hereinafter cited as *1978 House Report*]. The absence of federal involvement caused treatment of foreign banks in the United States to differ from state to state. Commenting on this pre-IBA treatment of foreign banks, the Senate Committee on Banking, Housing and Urban Affairs, noted in 1978:

> There is, at this time, no uniform national policy concerning foreign banking operations in this country. As a result, foreign banks enjoy many competitive advantages over our domestic banks. This bill establishes the principle of parity of treatment between foreign and domestic banks in like circumstances.

S.Rep. No. 1073, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 1421, 1422 [hereinafter cited as *1978 Senate Report*].

The IBA sought to provide foreign banks with "national treatment" under which "foreign enterprises ... are treated as competitive equals with their domestic counterparts." *1978 Senate Report, supra,* at 2. *See also International Banking Act of 1978: Hearings on H.R. 10899 before the Subcomm. on Financial Institutions of the Senate Comm. on Banking, Housing, and Urban Affairs,* 95th Cong., 2d Sess. 64 (1978); *1978 Senate Report, supra* at 18; *1978 House Report, supra,* at 5, 7, 8; 124

Cong.Rec. 26733 (1978) (remarks of Congressman Reuss). In other words, the IBA "establishes the principle of parity of treatment between foreign and domestic banks in like circumstances." *1978 Senate Report, supra,* at 2. In general the IBA provides that "with the approval of the Comptroller" a foreign bank may establish a branch or agency in a state, 12 U.S.C. § 3102(a) (Supp. V 1981) and that

> [e]xcept as otherwise specifically provided in this chapter or in rules, regulations, or orders adopted by the Comptroller under this section, operations of a foreign bank at a Federal branch or agency shall be conducted with the same rights and privileges as a national bank at the same location and shall be subject to all the same duties, restrictions, penalties, liabilities, conditions, and limitations that would apply under the National Bank Act to a national bank doing business at the same location....

IBA, § 4(b), 12 U.S.C. § 3102(b) (Supp. V 1981).

In this case the controversy centers on the Comptroller's interpretation of certain provisions of sections 4 and 5 of the IBA. Section 4(a), 12 U.S.C. § 3102(a) (Supp. V 1981), provides that the Comptroller may approve establishment of a foreign bank's federal branch or agency if "establishment of a branch or agency, as the case may be, by a foreign bank is not prohibited by State law." Section 4(d), 12 U.S.C. § 3102(d) (Supp. V 1981), reads: "Notwithstanding any other provision of this section, a foreign bank shall not receive deposits ... at any Federal agency." When a foreign bank opens a federally-chartered branch or agency outside of its home state,[3] section 5(a)(1), 12 U.S.C. § 3103(a)(1) (Supp. V 1981), provides that with certain exceptions "no foreign bank may directly or indirectly estab-

---

**2.** *See* 12 U.S.C. §§ 21 *et seq.* (1976 and Supp. V 1981). To receive deposits in the United States, a bank must be chartered or be given permission to operate by the federal or a state government. 12 U.S.C. § 378(a)(2) (Supp. V 1981).

**3.** The "home state" of a foreign bank is determined in accordance with Section 5(c) of the IBA and regulations issued by the Federal Reserve Board (12 C.F.R. § 211.22 (1983)), and generally is the first state in which the foreign bank establishes a branch that accepts deposits from domestic customers.

lish and operate a Federal branch outside of its home State unless (A) its operation is expressly permitted by the State in which it is to be operated . . . ." Section 5(a)(3), 12 U.S.C. § 3103(a)(3) (Supp. V 1981), likewise forbids a foreign bank to establish and operate a federal agency outside of its home state "unless its operation is expressly permitted by the State in which it is to be operated. . . ."

Section 1(b) of the IBA sets out the definition of terms used in the statute. So far as pertinent here, they are:

(1) "agency" means any office or any place of business of a foreign bank located in any State of the United States at which credit balances are maintained incidental to or arising out of the exercise of banking powers, checks are paid, or money is lent but at which deposits may not be accepted from citizens or residents of the United States;

\* \* \* \* \* \*

(3) "branch" means any office or any place of business of a foreign bank located in any State of the United States at which deposits are received;

\* \* \* \* \* \*

(5) "Federal agency" means an agency of a foreign bank established and operating under section [4] of this [Act];

(6) "Federal branch" means a branch of a foreign bank established and operating under section [4] of this [Act]. . . .

12 U.S.C. § 3101(1), (3), (5), (6) (Supp. V 1981).

The appellants complain that the Comptroller erred in interpreting these provisions of the IBA. They say that the Comptroller violated section 4(a) by approving the applications of five Australian banks to convert their state-licensed agencies in New York to home state federal branches although New York law prohibits such banks from opening branches. The appellants say that the Comptroller violated section 5(a) by approving the applications of two of the Australian banks to open interstate federal branches in Illinois in contravention of Illinois law. In the appellants' view, the

Comptroller also violated section 5(a) by authorizing a British bank's interstate federal branch located in the State of Washington to conduct business operations that are not permitted to foreign bank branches under Washington law. Finally, the appellants aver that the Comptroller incorrectly interpreted sections 1(b)(5) and 4(d) in permitting federal agencies of foreign banks to accept deposits if the depositors are neither citizens nor residents of the United States.

## II

In discussing the public comments regarding 12 C.F.R. pt. 28 (1980), promulgated pursuant to sections 4 and 13(a) of the IBA, 12 U.S.C. §§ 3102, 3108(a) (Supp. V 1981), the Comptroller noted "that in some states a foreign bank which applies for a state branch or agency must be able to demonstrate that the country under whose laws it was organized permits free or at least equivalent access to U.S. banks." 44 Fed.Reg. 65382 (1979). The Comptroller concluded however that "such a reciprocity approach" is not "binding upon the Comptroller's Office because it is incompatible with the national treatment theme of the IBA, and, further, it is in the nature of a condition or limitation rather than a prohibition on foreign entry." *Id.* The Comptroller bases this interpretation on his construction of the language of section 4(a) of the IBA, 12 U.S.C. § 3102(a) (Supp. V 1981), which provides:

Except as provided in section [5] of this [Act], a foreign bank which engages directly in a banking business outside the United States may, with the approval of the Comptroller, establish one or more Federal branches or agencies in any State in which (1) it is not operating a branch or agency pursuant to State law and (2) the establishment of a branch or agency, as the case may be, by a foreign bank is not prohibited by State law.

The Comptroller reasons that the words "a foreign bank" in subsection (2) are synonymous with "any foreign bank" so that the Comptroller can license a foreign bank to operate a federal branch in a particular

state unless that state prohibits all foreign banks from establishing state-chartered branches. Likewise, the Comptroller contends he can license a foreign bank to operate a federal agency in a particular state unless that state prohibits all foreign banks from establishing state-chartered agencies. *See* 44 Fed.Reg. 65382 (1979); Brief for Appellee at 11.

The appellants complain that by applying this construction of section 4(a) the Comptroller has approved the applications of five Australian banks to convert their state-licensed agencies in New York to home state federal branches although New York's bank reciprocity law[4] prohibits such banks from opening branches. Brief of Appellants at 21 & n. 25; J.A. 13, 15 (Complaint); *id.* 72 (Plaintiff's Amended Statement of Material Facts as to Which There Is No Genuine Issue). The appellants assert that the Comptroller erred in approving these applications. They argue that Congress in the IBA allowed the Comptroller to charter a foreign bank's office only in a state where that particular foreign bank is not prohibited from establishing state-chartered offices under state law. Brief of Appellants at 11.

The District Court agreed with the Comptroller's interpretation of section 4(a). The court said:

> A principal purpose of the 1978 Act was to give foreign banks "an important new option" in doing business in the United States; Congress understood that the federal chartering option might give overseas banks "opportunities which they do not now possess," even though it would also place new burdens of federal regulation on them. *See* Remarks of Mr. St. Germain, 122 Cong.Rec. 24403 (July 29, 1976). Plaintiffs' view of the Comptroller's authority would in effect nullify the federal option. A foreign bank, under plaintiffs' interpretation, would have a choice between compliance with State regulations under a State charter, and compliance with State *and* federal rules under a federal charter.

J.A. 100.[5]

## A

In support of their construction of the statute the appellants refer us to the legis-

---

4. N.Y. Banking Law § 202–a(2) (McKinney 1982).

5. Appellants argue that the District Court misunderstood their position. The appellants contend here, as they did before the District Court, that under the dual banking system embodied in the IBA a foreign bank may obtain a federal charter only if it could have obtained a state charter. They submit, however, that, contrary to the District Court's analysis, they do not seek to require the Comptroller to observe a state's discretionary chartering criteria. Rather, they contend only that the Comptroller must

> observe specific and general state *prohibitions* on foreign bank entry, *i.e.*, those state laws which bar entry by one or more foreign banks and which the affected banks have no power to cure by their own efforts. State capital adequacy requirements and similar "chartering standards," which foreign banks can take action to satisfy (*e.g.*, by raising more capital), are *not* "prohibitions" within the meaning of Sections 4(a) and 5(a).

Reply Brief of Appellants at 15 (emphasis in original). The Comptroller counters that section 4(c), 12 U.S.C. § 3102(c) (Supp. V 1981) (*see infra* note 15), contains the exclusive chartering requirements for foreign banks seeking to establish a federal branch or agency under section 4(a), and that state reciprocity laws are not "prohibitions" under section 4(a)(2). Brief for Appellee at 14–15.

We believe the District Court understood appellants' interpretation and merely extended that interpretation to its logical conclusion. Section 4(a) allows the Comptroller to charter a foreign bank's branch or agency unless, among other things, the establishment of a foreign branch or agency "is prohibited by state law." A state law that bars the establishment of a foreign branch or agency would seem a "state prohibition" whether the law was grounded on a failure to meet state chartering standards or on the failure to meet state reciprocity requirements. In either case, the state law would "prohibit" the foreign bank from opening a state-chartered office, and under the appellants' view of section 4(a), the foreign bank would therefore lose its option to seek a federal charter. We agree with the District Court that it would be inconsistent with the IBA's dual banking system concepts to require federal charter applicants to comply with both state and federal chartering standards. In addition, while appellants' definition of "state prohibition" would lessen this inconsistency, the legislative history contains no evidence that Congress intended the Comptroller to observe only those requirements in state law that "the

lative background of section 4(a). They direct our attention first to S. 958, 94th Cong., 1st Sess., 121 Cong.Rec. 5280 (1975), a bill the Federal Reserve Board submitted to the 94th Congress. This bill, introduced March 5, 1975, provided for federal regulation of foreign bank entry and operation in the United States. Section 18(b) of the bill provided in part:

> Notwithstanding the laws of any State, any foreign bank may, upon receipt of a certificate of authority from the Comptroller ... establish and operate one or more branches in any State ...."

Identical language appeared in H.R. 5617, 94th Cong., 1st Sess. (1975) introduced March 26, 1975. Testifying in support of the S. 958 before the Subcommittee on Financial Institutions of the Senate Committee on Banking, Housing, and Urban Affairs, Vice Chairman Mitchell of the Board of Governors of the Federal Reserve System said:

> The current pattern of State regulation may ... in some cases, lead to anticompetitive and other results not in the national interest. For example, a foreign bank may not be able to enter a U.S. banking market because of State law restrictions. This situation could in some cases prevent a domestic bank from that State from entering a foreign bank's home country if the home country imposes a reciprocity requirement.... Clearly, a national policy and national regulatory system are needed so questions of reciprocity, as well as other matters of national interest, can be judged on a national, not local level.

*Foreign Bank Act of 1975: Hearings on S. 958 Before the Subcomm. on Financial Institutions of the Senate Comm. on Banking, Housing, and Urban Affairs,* 94th Cong., 2d Sess. 45–46 (1976). A representative of the Conference of State Bank Supervisors (CSBS), an appellant in this case, expressed a contrary view:

> CSBS opposes proposals in S. 958 which would permit a federally licensed foreign facility to operate in a State, regardless

affected banks have no power to cure by their

of whether this might contravene State law.

> It is the position of CSBS that a State should have the authority to structure the financial institutions within its borders in a manner which it believes best serves the needs and interests of its residents, and that in the absence of some compelling national interest—which we do not believe present in this situation—the Federal Government should not preempt State statutes or regulations in this area.

*Id.* at 345. S. 958 and H.R. 5617 both died in committee.

Next, the appellants cite H.R. 12103, 94th Cong., 2d Sess. (1976), introduced February 25, 1976 and entitled "International Banking Act of 1976." H.R. 12103 in section 104(a) provided that "a foreign bank may, with the approval of the Comptroller, establish a Federal branch in any State in which (1) it is not operating a branch pursuant to State law and (2) the establishment of a branch by a foreign bank is not prohibited by State law." This bill died in committee.

A provision similar to section 4(a) of the International Banking Act of 1978 first appeared as section 4(a) of H.R. 13876, 94th Cong., 2d Sess. (1976), introduced May 18, 1976. H.R. 13876 passed the House July 29, 1976 but died in committee in the Senate. The House report on the bill, H.R.Rep. No. 1193, 94th Cong., 2d Sess. 12 (1976), states:

> *Section 4. Federal branches and agencies*
>
> Subsection (a) provides that the Comptroller is authorized to approve the establishment of a Federal branch or agency by a foreign bank in a state where it is not already operating a branch or agency under state law and where state law does not prohibit the establishment of a foreign branch or agency.

The language of section 4(a) of H.R. 13876 appeared again in H.R. 7325, 95th Cong., 1st Sess. (1977), introduced May 23, 1977. The appellants cite a comment by Chairman Arthur Burns of the Federal Reserve System in a letter to Congressman St. Germain, who introduced the bill:

own efforts."

[W]e do not believe that the States should have the authority in section 4 of the IBA to veto the entry of a Federal branch or agency. Such a State veto is not permitted in the case of the establishment of national banks or Edge Corporations, or even under the Bank Holding Act, and would thus represent a clear departure from the traditional operation of our dual-banking system. It may also serve to restrict both the development of and competition in new international banking markets in this country. We recommend therefore that State bank authorities instead be given a consultative role on Federal branch or agency entrance into their State.

*International Banking Act of 1977: Hearings on H.R. 7325 before the Subcomm. on Financial Institutions Supervision, Regulation and Insurance of the House Comm. on Banking, Finance, and Urban Affairs*, 95th Cong., 1st Sess. 107 (1977). The appellants also point to the testimony of Governor Gardner of the Federal Reserve System at the hearings:

Mr. Annunzio. Can you explain if any of our national objections [sic objectives?] have been impeded by State or city of [sic] foreign banking activity?

Governor Gardner. You ask me a very sensitive question. New York has a reciprocity law and in that reciprocity law the State Legislature of New York decided a long time ago that if New York banks can't accept deposits in a country abroad, the foreign banks from that country can't continue branch banking operations in New York. That is part of the law of New York State.

Let me just say this: I don't think the United States should have international reciprocity banking policies in 50 different State capitals. It doesn't really make much sense. I don't object to New York's law, but I point it out as something unusual.

*Id.* at 146. At these hearings on H.R. 7325, a representative of Appellant CSBS reaffirmed that organization's opposition to the federal chartering of foreign bank offices in

contravention of state law. *Id.* at 310. H.R. 7325 was never reported out of committee.

Finally, appellants turn to H.R. 10899, 95th Cong., 2d Sess. (1978), introduced February 9, 1978. This bill became the International Banking Act of 1978. The appellants cite the comment on section 4 of the Act that appears in a letter from Chairman Miller of the Board of Governors of the Federal Reserve System to Senator Proxmire, Chairman of the Senate Committee on Banking, Housing, and Urban Affairs, as follows:

Federal branches and agencies would only be permitted in a State in which the foreign bank does not operate a State branch or agency *and* which does not by law prohibit the establishment of branches and agencies of foreign banks. In effect, this provision permits States to veto the establishment of federally-sanctioned banking offices. This result is a clear departure from the dual banking system. The Board recommends that States be afforded a consultative role on the establishment of Federal branches and agencies but that the States not be placed in a position of vetoing such offices.

*International Banking Act of 1978: Hearings on H.R. 10899 Before the Subcomm. on Financial Institutions of the Senate Comm. on Banking, Housing, and Urban Affairs*, 95th Cong., 2d Sess. 391 (1978) (Letter dated June 1, 1978 from Chairman G. William Miller to Senator Proxmire) (emphasis in original). Appellants also direct us to portions of the House and Senate committee reports that accompanied the IBA. The Senate report stated:

Section 4 provides that, subject to the approval of the Comptroller of the Currency, a foreign bank may establish a Federal branch or agency in any State where it does not already operate a State-licensed branch or agency, and in which the establishment of a branch or agency is not prohibited by State law. This insures that in States where foreign banks

are welcome, they will have a State-Federal option.

*1978 Senate Report, supra,* at 6. The House committee report likewise stated, "While recognizing that current regulation of foreign banks is in the hands of the States, and providing a framework which will allow this to continue, the bill also provides the option of Federal chartering." *1978 House Report, supra,* at 5.

Appellants argue that Congress rejected S. 958 in response to the testimony of state banking regulators seeking to preserve state reciprocity requirements. Thus, in appellants' view, rejection of S. 958 evidences Congressional support for state reciprocity laws. In addition, they note that while the IBA and its forerunners were in committee, the Federal Reserve Board objected to any state veto power over the entry of federally-chartered foreign banks. Congress, however, did not change the bills in response to these objections. Appellants argue that Congress' refusal to change the bills provides further evidence that Congress was acting in accord with appellants' testimony that the Comptroller be required to observe state reciprocity laws. Appellants, therefore, contend that section 4(a) requires the Comptroller to observe these laws.

The Comptroller counters by pointing to an amendment to the IBA proposed by Representative Grassley of Iowa. That amendment caused an earlier version of section 9(a) to read in part as follows:

The Secretary of the Treasury in issuing guidelines under this section, and the Federal regulatory agencies in the administration of this Act, shall seek to achieve a parity of treatment for foreign banks, branches, agencies, and commercial lending companies relative to their domestic counterparts. It is the purpose of this Act to establish a basic statutory framework which, given due consideration to the structure of our domestic monetary mechanisms and our national interests, will, to the extent practical, allow foreign banking institutions to have the same rights, duties, and privileges and be subject to the same limitations, restrictions,

or conditions as our domestic banking institutions, *but the Secretary of the Treasury is authorized and directed to take into account the treatment by foreign governments of financial institutions domiciled in the United States which do business in their respective countries.*

*See International Banking Act of 1978: Hearings on H.R. 10899 before the Subcomm. on Financial Institutions of the Senate Comm. on Banking, Housing and Urban Affairs,* 95th Cong., 2d Sess. 341–42 (1978) (House-passed version of section 9 with emphasis added to show Grassley Amendment); *1978 House Report, supra,* at 4 (Grassley Amendment); 124 Cong.Rec. 9084 (1978) (remarks of Congressman Grassley). The House Committee on Banking, Finance, and Urban Affairs adopted this amendment, believing that "the principle of reciprocity should ... be taken into account," *1978 House Report, supra,* at 13, and the full House passed this version. *See* 124 Cong.Rec. at 9103 (1978). The Senate, however, passed a substantially revised version of section 9, deleting the Grassley Amendment. *See* 124 Cong.Rec. at 26128 (1978). Neither the report from the Senate Committee on Banking, Housing, and Urban Affairs (*1978 Senate Report, supra*), nor the legislative debate in the Senate explain the deletion. The House concurred in the Senate version. *See* 124 Cong.Rec. at 26726–34 (1978). The Comptroller contends that rejection of the Grassley Amendment signalled Congressional rejection of reciprocity as a chartering standard for federal offices of foreign banks.

With respect to the parties' arguments concerning the legislative history, the District Court said:

Because Congress intended to accord national treatment to foreign banks that sought the benefits and burdens of federal control, it was proper for the Comptroller to deem the proviso of section 4(a) only to allow States to permit or to veto federally-chartered offices, and not to condition their entry. As the 1978 Senate Report observed, section 4 "insures that in States where foreign banks are wel-

come, they will have a State-Federal option." *Id.* Section 4 thus extended the federal option to those States, in the Report's words, "where foreign banks are welcome," not where particular banks, or where banks from particular countries, are welcome.

Revisions in the text of the Act prior to final passage in 1978, said by both parties to support their own views of section 4(a), are treacherous guides for interpretation of the Act. The fact that Congress rejected a 1975 version of the Act, S. 958, that would have wholly denied the States the veto power that section 4(a) grants them does not, in itself, demonstrate that section 4(a) granted the States something other than the veto power the Comptroller concedes. Similarly, the opposition of federal banking authorities to any provision that would make state reciprocity requirements a part of the new international banking law, voiced at hearings on H.R. 7325 in 1977, cannot provide proof that they assumed that section 4(a) would have such a feature. *See International Banking Act of 1977: Hearings on H.R. 7325 Before the Subcomm. on Financial Institutions Supervision, Regulation, and Insurance of the House Comm. on Banking, Housing, and Urban Affairs,* 95th Cong., 1st Sess. (1977) 39–41 (remarks of Federal Reserve Board Governor Gardner). Defendant, on the other hand, attempts to rely upon the rejection of the so-called "Grassley amendment" in 1978, which would have authorized federal officials to consider treatment of American financial institutions in the home country of a foreign bank in deciding whether to charter that bank in the United States. It is arguable, as defendant suggests, that Rep. Grassley would not have proposed such a program for federal enforcement of national reciprocity if he thought State reciprocity was already a part of the Act. But, as an expression of the intent of Congress as a whole, the final terms of section 4 and the broad design of the Act appearing elsewhere in the legislative history provide a more substantial basis for the Comptroller's rejection of plaintiffs' argument. J.A. 100–01.

Appellants also contend that Congress intended section 4(a) to maintain "the states' preexisting power to determine the structure of foreign banking institutions within their borders . . . ." Brief of Appellants at 27. In the appellants' view, in passing section 4(a) Congress "consciously followed" the policies of a dual banking system found in the Douglas Amendment to the Bank Holding Company Act of 1956, 12 U.S.C. § 1842(d) (Supp. V 1981), and in the McFadden Act, 12 U.S.C. § 36 (1976). Brief of Appellants at 27. The Douglas Amendment provides:

> Notwithstanding any other provision of this section, no application (except an application filed as a result of a transaction authorized under section 13(f) of the Federal Deposit Insurance Act) shall be approved under this section which will permit any bank holding company or any subsidiary thereof to acquire, directly or indirectly, any voting shares of, interest in, or all or substantially all of the assets of any additional bank located outside the State in which the operations of such bank holding company's banking subsidiaries were principally conducted on July 1, 1966, or the date on which such company became a bank holding company, whichever is later, unless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication. For the purposes of this section, the State in which the operations of a bank holding company's subsidiaries are principally conducted is that State in which total deposits of all such banking subsidiaries are largest.

12 U.S.C. § 1842(d) (Supp. V 1981).

Appellants argue that the Douglas Amendment and section 4(a) reflect similar policies; both grant a state the power to control which banking institutions organized outside of its borders may enter that

state. They direct our attention to the language of the Douglas Amendment which states that the Board of Governors of the Federal Reserve System shall not approve a bank holding company's application to acquire any voting shares or substantially all the assets of a bank located outside the state in which the operations of the bank holding company are principally conducted "unless the acquisition of such shares or assets of a State bank by an out-of-State bank holding company is specifically authorized by the statute laws of the State in which such bank is located . . . ." 12 U.S.C. § 1842(d) (Supp. V 1981) (emphasis added). Appellants note the similarity between the quoted language in the Douglas Amendment and the analogous proviso in section 4(a)(2). *See* 12 U.S.C. § 3102(a)(2) (Supp. V 1981) ("the establishment of a branch or agency . . . by a foreign bank is not prohibited by State law"). They then refer us to *Iowa Independent Bankers v. Board of Governors of the Federal Reserve System,* 167 U.S.App.D.C. 286, 511 F.2d 1288, *cert. denied,* 423 U.S. 875, 96 S.Ct. 144, 46 L.Ed.2d 106 (1975), a case involving the Douglas Amendment in which this court rejected arguments similar to those the Comptroller has made in this case to support his interpretation of section 4(a). In the *Iowa Inde-*

*pendent Bankers* case, an organization of Iowa bankers argued that the Douglas Amendment did not permit the states to discriminate among out-of-state bank holding companies when deciding which bank holding companies could enter that state. The bankers argued that the states could prohibit all out-of-state bank holding companies from entering or it could prohibit none. *Id.* at 294, 511 F.2d at 1296. This court rejected that argument, ruling that the Douglas Amendment empowered states to discriminate among out-of-state bank holding companies when deciding which could enter. *Id.* at 295, 511 F.2d at 1297. Appellants argue that section 4(a) uses the same "statutory formulation" as the Douglas Amendment and should be interpreted similarly. *See* Reply Brief of Appellants at 10. The District Court did not address this argument.

Appellants also argue that in enacting the IBA, Congress sought to apply the policies of the McFadden Act, 12 U.S.C. § 36(c) (1976),[6] to the entry of a federally-chartered foreign bank into its home state. The McFadden Act provides that the Comptroller may approve a national bank's application to establish an additional branch office in the state of its principal office only if

---

**6.** 12 U.S.C. § 36(c) (1976) provides:

A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. In any State in which State banks are permitted by statute law to maintain branches within county or greater limits, if no bank is located and doing business in the place where the proposed agency is to be located, any national banking association situated in such State may, with the approval of the Comptroller of the Currency, establish and operate, without

regard to the capital requirements of this section, a seasonal agency in any resort community within the limits of the county in which the main office of such association is located, for the purpose of receiving and paying out deposits, issuing and cashing checks and drafts, and doing business incident thereto: *Provided,* That any permit issued under this sentence shall be revoked upon the opening of a State or national bank in such community. Except as provided in the immediately preceding sentence, no such association shall establish a branch outside of the city, town, or village in which it is situated unless it has a combined capital stock and surplus equal to the combined amount of capital stock and surplus, if any, required by the law of the State in which such association is situated for the establishment of such branches by State banks, or, if the law of such State requires only a minimum capital stock for the establishment of such branches by State banks, unless such association has not less than an equal amount of capital stock.

that state's laws would authorize a state-chartered bank to open such an additional branch office. *See First National Bank of Logan v. Walker Bank & Trust Co.,* 385 U.S. 252, 258–62, 87 S.Ct. 492, 495–97, 17 L.Ed.2d 343 (1966).

The district court rejected this argument, stating:

> The McFadden Act itself is irrelevant to the Congressional design in section 4(a), which only governs entry of foreign banks into the United States market under federal charter; in furtherance of its policy favoring parity for foreign and domestic banks holding federal charters, Congress elsewhere expressly adopted McFadden Act principles by providing in section 4(h) of the 1978 Act that intrastate branching by federally-chartered foreign banks should occur under the same rules as those applicable to domestic national banks. Congress thus appears to have well understood the reach of the McFadden Act, and to have chosen in the 1978 Act to limit the McFadden Act's force to intrastate branching.

J.A. 102.

### B

The language of section 4(a) does not preclude either of the proffered interpretations. Moreover, we believe the legislative history of the IBA does not offer clear guidance on the meaning of section 4(a). Admittedly, S. 958, which allowed a state no control over a federally-chartered foreign bank's entry, died in committee, and section 4(a), which allowed a state some control over entry, was enacted. As the District Court correctly noted, these facts alone do not establish that section 4(a) granted the states a veto power greater than the veto power, conceded by the Comptroller, to prohibit the entry of *all* foreign banks. We are hesitant to accord weight to Congress' unexplained inaction on S. 958. *See generally Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381 n. 11, 89 S.Ct. 1794, 1802 n. 11, 23 L.Ed.2d 371 (1969); *FTC v. Dean Foods Co.,* 384 U.S. 597, 609–10, 86 S.Ct. 1738, 1745–46, 16 L.Ed.2d 802

(1966). Similarly, Federal Reserve Board Chairman Burns' letter and Board Governor Gardner's testimony, included in the H.R. 7325 hearings, and Board Chairman Miller's letter, submitted during the H.R. 10899 hearings, do not conclusively demonstrate that the Board believed section 4(a) granted the states more veto power than the Comptroller concedes. Moreover, appellants do not refer us to any other part of the IBA's legislative history where the Federal Reserve Board's objection is more conclusively explained, or even mentioned. Even if the Board interpreted section 4(a) as appellants now do, this single reference hardly provides substantial evidence that Congress adopted this interpretation "since the views expressed by witnesses at congressional hearings are not necessarily the same as those of the legislators ultimately voting on the bill." *Austasia Intermodal Lines, Ltd. v. FMC,* 188 U.S.App.D.C. 379, 382, 580 F.2d 642, 645 (1978) (citations omitted). The House and Senate committee reports cited by appellants likewise do not clearly support one interpretation over the other. The Senate report states that "where foreign banks are welcome, they will have a State-Federal option." *1978 Senate Report, supra,* at 6 (emphasis added). Contrary to the appellants' view, this passage seems to indicate that the availability of a foreign bank's "federal option" will be predicated on a state's decision to welcome foreign banks generally, and not on a state's decision to welcome a particular foreign bank. The House report cited by appellants states only that the IBA will allow the states to continue their regulation of foreign banks. *1978 House Report, supra,* at 5. There is no dispute, however, that the IBA ends the states' exclusive regulation of foreign banking, and yet, the cited portion of the *1978 House Report* offers no view as to what state regulatory power over foreign banks survives the IBA's passage. Lastly, Congress' failure to adopt the Grassley Amendment provides little insight in analyzing section 4(a). The Comptroller may be correct that Congress rejected the Grassley Amendment because it rejected reciprocity as a federal chartering criterion; however,

as appellants contend, Congress may have rejected the Grassley Amendment simply because it preferred the enforcement of state reciprocity requirements already incorporated in section 4(a) to the creation of a uniform reciprocity policy at the federal level. In sum, we find unconvincing both appellants' and appellee's arguments based on the legislative background of the IBA, and decline to rest our resolution of the section 4(a) issue on such meager grounds.

The District Court did not address appellants' argument with respect to the Douglas Amendment, but we find it without merit. We believe *Iowa Independent Bankers* is distinguishable from this case. The court there suggested several reasons for its refusal to adopt an all-or-nothing interpretation of a state's veto power over an out-of-state bank holding company's decision to acquire an in-state bank. First, the court noted "that nothing in the language of section 1842(d) points to this [all-or-nothing interpretation] ...." 167 U.S.App.D.C. at 294, 511 F.2d at 1296. Here, however, the language of section 4(a) at least suggests that states were not given the power to discriminate in allowing foreign banks to enter. Section 4(a) provides:

> Except as provided in section [5] of this [Act], a foreign bank which engages directly in a banking business outside the United States may, with the approval of the Comptroller, establish one or more Federal branches or agencies in any State in which (1) it is not operating a branch or agency pursuant to State law and (2) the establishment of a branch or agency, as the case may be, by a foreign bank is not prohibited by State law.

12 U.S.C. § 3102(a) (Supp. V 1981). Congress begins this section by referring generally to "a foreign bank." In subsection (1), it narrows the focus to a particular bank: "[A] foreign bank ... may ... establish one or more Federal branches or agencies in any State in which (1) *it* is not operating a branch or agency pursuant to State law ...." *Id.* (emphasis added). In subsection (2), however, Congress refers simply to "a foreign bank" again; it does not follow through with the specific reference contained in subsection (1). While this differ-

ence is not dispositive, it does support the Comptroller's interpretation.

The second reason given in *Iowa Independent Bankers* was that an all-or-nothing interpretation of the Douglas Amendment conflicted with section 7 of the Bank Holding Company Act, 12 U.S.C. § 1846 (1976). 167 U.S.App.D.C. at 294, 511 F.2d at 1296. That section provides:

> The enactment by the Congress of this chapter shall not be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with respect to banks, bank holding companies, and subsidiaries thereof.

We find no comparable section in the IBA. Lastly, the court found that the legislative history demonstrated that Congress intended to allow a state to discriminate in admitting bank holding companies. 167 U.S.App. D.C. at 294–95, 511 F.2d at 1296–97. As discussed above, however, the legislative history of the IBA does not provide explicit support for a similar interpretation of section 4(a).

In short, we find two arguably correct interpretations of an ambiguous statutory provision. The relevant legislative history contains no explicit support for either interpretation. Under these circumstances, we believe section 4(a) can only be interpreted in the light of Congress' overriding objective in enacting the IBA. We find the legislative history replete with references to Congress' intent to accord foreign banks national treatment, under which "foreign enterprises ... are treated as competitive equals with their domestic counterparts." *1978 Senate Report, supra,* at 2. The House Report accompanying H.R. 10899 stated:

> The bill incorporates two principal policy objectives. The first objective is to provide a system of Federal regulation of foreign banking activities.... The second objective is to provide to the extent possible or appropriate equal treatment for foreign and domestic banks operating in the United States.

*1978 House Report, supra,* at 5.

> [T]he objectives of this legislation are to provide Federal regulation of foreign

banks and to insure equal treatment for foreign and domestic banks operating in the United States. But there is recognition of the fact that the same regulatory structure for foreign and domestic banks will not result in equal treatment and that discretion is needed to devise a regulatory framework which is appropriate to the actual operations and status of foreign banking institutions. The intent of the bill is to ensure that foreign banking activities in the United States conform more closely to activities permissible for domestic banks without dismantling or disrupting existing operations more than necessary to meet the objective.

*Id.* at 8.

The Senate Report echoes a similar theme: "The general policy of the United States with regard to foreign enterprises doing business in the United States has been one of national treatment." *1978 Senate Report, supra,* at 2, U.S.Code Cong. & Admin.News 1978, p. 1422. "The committee thus believes national treatment is the most appropriate policy to adopt with respect to foreign banks in the United States ...." *Id.* at 9, U.S.Code Cong. & Admin. News 1978 p. 1429. We conclude from these passages that the IBA seeks to treat federally-chartered foreign and domestic banks as similarly as possible under the Act.

Thus, turning to section 4(a), we believe Congress sought to treat the establishment of a foreign bank's federally-chartered offices similarly to the establishment of the offices of its "domestic counterparts." In so doing, we must determine whether Congress intended the opening of the first office in a federally-chartered foreign bank's home state to parallel the opening of a federally-chartered domestic bank's principal office or the opening of a branch office of such a bank. The language of section 4(h) suggests that establishment of a foreign bank's initial home state office parallels the establishment of a domestic national bank's principal office. That section provides in part:

A foreign bank with a Federal branch or agency operating in any State may (1) with the prior approval of the Comptroller establish and operate additional branches or agencies in the State in which such branch or agency is located on the same terms and conditions and subject to the same limitations and restrictions as are applicable to the establishment of branches by a national bank if the principal office of such national bank were located at the same place as the initial branch or agency in such State of such foreign bank and (2) change the designation of its initial branch or agency to any other branch or agency subject to the same limitations and restrictions as are applicable to a change in the designation of the principal office of a national bank if such principal office were located at the same place as such initial branch or agency.

12 U.S.C. § 3102(h) (Supp. V 1981). Thus, for purposes of establishing additional offices in the home state, a foreign bank's initial home state office is equated with a domestic national bank's principal office. This comports with the IBA's objective of national treatment by allowing foreign banks to open additional home state offices on the same terms as could federally-chartered domestic banks under the McFadden Act.[7] Second, for purposes of changing the designation of the initial office, a foreign bank's initial home state office is again equated with a domestic national bank's principal office.

The House report provides further evidence that establishment of the initial home state office is analogous to establishment of a national bank. "For purposes of the McFadden Act and Federal banking law in general," the report states, "the branches [established under section 4] would be treated as if they are national banks *or* branches thereof." *1978 House Report, supra,* at 12 (emphasis added). We believe that the most reasonable conclusion to draw from this language and the language of section

---

**7.** We agree with the District Court that the principles of the McFadden Act are irrelevant

to the establishment of a federally-chartered foreign bank's *initial* home state office.

4(h) is that establishment of a foreign bank's initial home state office is analogous to establishment of a domestic bank's principal office. Congress' intent to distinguish establishment of the initial office from the establishment of additional home state offices is evidenced in section 4(h). Moreover, the Committee's statement that for purposes of the McFadden Act a branch could be treated as "a national bank *or* branch thereof" would be redundant unless "national bank" and "branch thereof" differed conceptually.

Having decided that the establishment of a foreign bank's federally-chartered bank's *initial* home state office is analogous to the establishment of a domestic bank's federally-chartered principal office, we note that a state cannot prohibit establishment of a federally-chartered domestic bank's principal office. *See Pineland State Bank v. Proposed First National Bank of Bricktown,* 335 F.Supp. 1376, 1379 (D.N.J.1971). *See generally* 12 U.S.C. §§ 26, 27 (Supp. V 1981). Section 4(a) of the IBA, however, grants a state some control over establishment of a federally-chartered *foreign* bank's initial office. By treating a foreign bank differently from a domestic bank, section 4(a) departs from the IBA's theme of national treatment. However, we believe that where, as here, a provision of the IBA is unclear, it should be construed to minimize any departure from the IBA's overrid-

ing objective of national treatment. National treatment would preclude any state regulation of a federally-chartered foreign bank's initial home state office. We find that the Comptroller's interpretation of section 4(a), approved by the District Court, permits as little state regulation of the establishment of such offices as is consistent with the terms of section 4(a). Accordingly, we affirm the Comptroller's interpretation of section 4(a).[8]

### III

Turning now to the second issue in this appeal, we must address the extent to which the Comptroller must defer to state law in licensing a foreign bank's federal interstate office.[9] We also must consider whether the IBA requires a federal interstate office to comply with the limitations on bank operations imposed by the receiving state.

### A

Section 4(a), 12 U.S.C. § 3102(a) (Supp. V 1981), provides the general framework for chartering any federal branch or agency.[10] That section, however, begins "[e]xcept as provided in section [5]," and section 5, *id.* § 3103, sets out additional requirements for establishing and operating a federal interstate branch or agency. Section 5(a) provides in part:

**8.** Illinois Bankers Association, Independent Community Banks in Illinois, Mid-American Legal Foundation, and the Chicago Association of Commerce and Industry, as *amici curiae,* filed a brief in support of the appellants. They argue that requiring the Comptroller to defer to state reciprocity requirements would not conflict with the IBA and that those requirements, therefore, should not be held to be preempted. For the reasons stated in text, we believe the IBA's theme of national treatment for foreign banks requires an interpretation of section 4(a) that grants the states as little control over the entry of federally-chartered foreign banks as is consistent with the statutory language and the legislative history. Thus, in our view, application of state reciprocity requirements to the establishment of the federally-chartered foreign bank's initial home state office would conflict with the IBA, and cannot be enforced. *Cf. Conference of State Bank Supervisors v. Con-*

*over,* 710 F.2d 878 (D.C.Cir.1983) (affirming Comptroller's regulations preempting inconsistent state law restrictions on adjustable rate mortgages offered or purchased by national banks).

**9.** In the context of this opinion, an "interstate office" is a branch or agency of a foreign bank located, or to be located, in a state other than the foreign bank's home state. *See supra* note 3 (definition of home state). And, the state in which the interstate office is located is termed the "receiving state."

**10.** Section 1(b)(5), 12 U.S.C. § 3101(5) (Supp. V 1981), defines a federal agency as an agency of a foreign bank established and operating under section 4. Similarly, section 1(b)(6), *id.* § 3101(6), defines a federal branch as a branch of a foreign bank established and operating under section 4.

(a) Except as provided by subsection (b) of this section,

(1) no foreign bank may directly or indirectly establish and operate a Federal branch outside of its home State unless

(A) its operation is expressly permitted by the State in which it is to be operated, and

(B) the foreign bank shall enter an agreement or undertaking with the Board to receive only such deposits at the place of operation of such Federal branch as would be permissible for a corporation organized under section 25(a) of the Federal Reserve Act [12 U.S.C. 611 et seq.] under rules and regulations administered by the Board;

(2) no foreign bank may directly or indirectly establish and operate a State branch outside of its home State unless

(A) it is approved by the bank regulatory authority of the State in which such branch is to be operated, and

(B) the foreign bank shall enter an agreement or undertaking with the Board to receive only such deposits at the place of operation of such State branch as would be permissible for a corporation organized under section 25(a) of the Federal Reserve Act under rules and regulations administered by the Board;

(3) no foreign bank may directly or indirectly establish and operate a Federal agency outside of its home State unless its operation is expressly permitted by the State in which it is to be operated;

(4) no foreign bank may directly or indirectly establish and operate a State agency or commercial lending company subsidiary outside of its home State, unless its establishment and operation is approved by the bank regulatory authority of the State in which it is to be operated . . . .

12 U.S.C. § 3103 (Supp. V 1981) (indentation added).

Pursuant to his authority under section 13, *id.* § 3108(a), the Comptroller adopted the following definitions and interpretation:

A "Federal branch" is an office or place of business, licensed by the Comptroller and operated by a foreign bank in any State of the United States, which can engage in the business of banking, including the exercise of fiduciary powers and the acceptance of deposits from citizens and residents of the United States.

12 C.F.R. § 28.2(c) (1980).

A "Limited Federal branch" is a Federal branch licensed by the Comptroller which, pursuant to an agreement between the parent foreign bank and the Federal Reserve Board, can receive only such deposits as would be permissible for an Edge Corporation organized under section 25(a) of the Federal Reserve Act (12 U.S.C. 611). Except for this restriction, a Limited Federal branch can exercise the full range of powers available to any Federal branch.[11]

12 C.F.R. § 28.2(d) (1980). *See also infra* note 19 (text of 12 C.F.R. § 28.2(b) (1980), defining "Federal agency").

Limited Federal branches can accept only such types of deposits as are permissible to Edge Corporations pursuant to 12 U.S.C. 615 and 12 C.F.R. Part 211. Apart from these exemptions or qualifications, Federal branches and agencies can engage in the same type of business and exercise the same powers as a national bank, subject to the conditions and requirements contained in the statutes and any implementing rules and regulations promulgated by the federal banking authorities.

12 C.F.R. § 28.101.3 (1980).

In his discussion of the public comments to these regulations, the Comptroller rejected the application of state reciprocity laws to the federal chartering of foreign bank

---

**11.** An Edge Act corporation can "receive only such deposits within the United States as may be incidental to or for the purpose of carrying out transactions in foreign countries or depend-

encies or insular possessions of the United States . . . ." 12 U.S.C. § 615(a) (Supp. V 1981). *See also* 12 C.F.R. § 211.4 (1983).

branches and agencies. *See* 44 Fed.Reg. 65382 (1979).

Appellants contend that the Comptroller's interpretation of section 5, as reflected in the above quoted provisions, violates section 5 in two ways. First, the Comptroller's interpretation enables him to license a foreign bank's federal interstate office in a receiving state that does not expressly permit that particular foreign bank to establish a state-chartered interstate office. Second, even if the receiving state permitted a particular foreign bank to establish an interstate office, the Comptroller's interpretation does not require that the bank operations of the federal interstate office be "expressly permitted" by the receiving state. Brief of Appellants at 44–45. Appellants complain that the Comptroller has approved two applications by Australian banks to establish an interstate federal branch in Illinois in violation of Illinois' banking reciprocity law. Brief of Appellants at 52 n. 76; J.A. 73–74 (Plaintiff's Amended Statement of Material Facts as to Which There Is No Genuine Issue). *See* Ill.Rev.Stat. ch. 17 § 2710 (1981). Appellants also complain that the Comptroller has approved an application by a British bank to establish an interstate federal branch in Washington State without requiring that branch to comply with lending restrictions and other operational limitations imposed on a foreign bank's branches by Washington law. J.A. 13, 15 (Complaint); *id.* 72–73 (Plaintiff's Amended Statement of Material Facts as to Which There Is No Genuine Issue). *See* Wash.Rev.Code § 30.42.110 (repealed 1982); *see also* Wash.Rev.Code § 30.42.105 (Supp. 1982) (foreign bank branches: Power to make loans and to guarantee obligations); *id.* § 30.42.155 (foreign bank branches: Powers and activities).

The Comptroller contends that a state has essentially the same power to veto the entry of a federal interstate office under section 5(a) as it has to veto the entry of a federal home state office under section 4(a).[12] Thus, the Comptroller contends that he can license a foreign bank's interstate branch unless the receiving state permits *no* foreign bank to operate a state-chartered branch.[13] Similarly, he can license a foreign bank's interstate federal agency unless the receiving state permits *no* foreign bank to operate a state-chartered agency. Brief for Appellee at 19.

In support of his interpretation of the statute, the Comptroller compares sections 5(a)(1)(A) and 5(a)(3) with sections 5(a)(2)(A) and 5(a)(4). Under sections 5(a)(1)(A) and 5(a)(3), no foreign bank can establish or operate a federal interstate office unless that office's operation is "expressly permitted" by the receiving state. Under sections 5(a)(2)(A) and 5(a)(4), on the other hand, no foreign bank can establish or operate a state-chartered interstate office unless that office is "approved" by the receiving state. The Comptroller contends that the approval required in sections 5(a)(2)(A) and 5(a)(4) requires the receiving state to approve *each* application. He concludes: "Thus, the structure of § 5(a) makes it clear that 'approval' (for state-chartered offices) means specific resolution of the *particular application* involved, whereas 'express permission' (for federally-chartered offices) means a general authorization for the *kind* of office (i.e., branch or agency) proposed." Memorandum in Support of Defendant's Motion for Summary Judgment at 13 (record document 4) (emphasis in original).

The Comptroller further contends that section 5(a) does not subject a federal interstate office to limitations on business opera-

**12.** In the Comptroller's view, section 5(a) expands the states' section 4(a) veto power only in so far as section 5(a) prohibits him from licensing an interstate branch or agency if the receiving state's law is silent as to whether foreign banks in general could establish a state chartered branch or agency. Letter from R. Craig Lawrence (Counsel for Appellee) to Clerk, United States Court of Appeals for the District of Columbia Circuit (June 4, 1982) (supplementing answers proffered at oral argument).

**13.** A foreign bank seeking to establish an interstate branch must also comply with sections 5(a)(1)(B) or 5(a)(2)(B), neither of which are at issue here.

tions that the receiving state's law imposes on a foreign bank's state-chartered interstate office. The Comptroller says that section 4(b), which provides in part that "operations of a foreign bank at a Federal branch or agency shall be conducted with the same rights and privileges as a national bank in the same location," sets out the operating limitations of every federal branch or agency.[14] He reasons that the word "operation" in sections 5(a)(1)(A) and 5(a)(3), therefore, refers to the fact of operation and not to the specific operational activities of an interstate office. If section 5(a) subjected a federal interstate office to state law restrictions on its operation, the Comptroller maintains, then that office would not have the powers of a national bank. Brief for Appellee at 40–42. Additionally, he asserts that appellants' interpretation would deny foreign banks "the options inherent in the dual banking system," which options he describes as "[t]wo separate sets of regulatory and operating (as well as chartering) criteria." *Id.* at 36, 41. The Comptroller therefore maintains that section 5(a) is not an exception to section 4(b), and that section 4(c),[15] which makes no mention of state law requirements, provides the criteria for chartering home state and interstate federal offices. Lastly, the Comptroller contends that if federal interstate offices were subject to the same limitations as state-chartered offices of foreign banks, "[t]here would never be any reason for a foreign bank to apply for a federal license outside its home state." Brief for Appellee at 43.

Appellants maintain that section 5(a) prohibits a foreign bank from establishing or operating a federal interstate branch or agency unless both the establishment and business operations of that office are ex-pressly permitted by the receiving state. Appellants direct our attention to Congress' use of the terms "its" and "it" throughout section 5(a), arguing that this language demonstrates that the Comptroller cannot license a foreign bank's federal interstate office unless "the creation and activities of *each* interstate federal branch or agency . . . [are] 'expressly permitted' by the relevant state." Brief of Appellants at 44. The use of "expressly permitted" in sections 5(a)(1)(A) and 5(a)(3) and "approved" in sections 5(a)(2)(A) and 5(a)(4) was necessary, appellants contend, because federal and state offices of foreign banks are chartered by different authorities. Under section 4(a), a foreign bank seeking a federal branch or agency must secure the Comptroller's approval. Likewise, a foreign bank seeking to establish a state-chartered branch or agency must secure that state's approval. Appellants argue that since Congress had already stated in section 4(a) that a foreign bank seeking to establish a federal branch or agency had to secure the Comptroller's approval, there was no need to restate this in section 5(a). Section 5(a), however, permits the Comptroller to approve an application only if the business operations of that foreign bank's branch or agency are expressly permitted by the receiving state. Brief of Appellants at 45–46.

With respect to the operations of a foreign bank's interstate office, appellants note that section 4(b) states: "Except as otherwise specifically provided in this [Act]"; they contend that Congress provided "otherwise" in section 5(a). Appellants also point to the difference between section 4(a), which refers to the establishment of a foreign bank office, and section 5(a), which refers both to the establishment and the

---

**14.** Acknowledging that section 4(b) is applicable only "[e]xcept as otherwise specifically provided" in the IBA, the Comptroller states: "Had Congress intended for section 4(b) to be preempted by section 5(a), it could and would have said so much more clearly." Brief for Appellee at 39.

**15.** Section 4(c), 12 U.S.C. § 3102(c) (Supp. V 1981), provides:

In acting on any application to establish a Federal branch or agency, the Comptroller shall take into account the effects of the proposal on competition in the domestic and foreign commerce of the United States, the financial and managerial resources and future prospects of the applicant foreign bank and the branch or agency, and the convenience and needs of the community to be served.

operation of a foreign bank office. They conclude that: "The terms 'operate' and 'operation' clearly show the intent of Congress to require express state permission for the business functions of interstate federal branches and agencies." Reply Brief of Appellants at 21. Appellants also contend that foreign banks would have a federal option as well as a state option under their interpretation of section 5(a) because appellants seek to impose on federal interstate offices only state laws that define "the permissible *business functions* of foreign bank branches and agencies," and *not* "state capital adequacy and other 'safety and soundness' requirements and state supervisory procedures." Reply Brief of Appellants at 26 (emphasis in original). Thus, appellants contend, the Comptroller can make the federal interstate license attractive to foreign banks by adopting liberal requirements in the area of discretionary supervisory standards.

In support of their construction of the statute, appellants turn to the legislative history. The Senate committee report stated:

> Under Section 5(a) foreign banks, as now, and as under the House-passed bill, would be able to establish branch or agency offices in any State where this is permissible. The decision to attract foreign bank entry is, as now, left to the individual States.

*1978 Senate Report, supra,* at 10, U.S.Code Cong. & Admin.News 1978, p. 1430.

> The section thus affirms in Federal law the right of States to attract foreign banks and foreign investment by allowing foreign bank branches and agencies to be established in any State where permissible. . . . [F]oreign bank branches and agencies would be able, with appropriate State approval where necessary, to make both domestic and international commerical [sic] loans at locations throughout the country.

*Id.* at 11, U.S.Code Cong. & Admin.News 1978, p. 1431.

> [Section 5] leaves each State free to decide whether and to what extent it wishes to permit foreign banks and limits only the single activity—deposit-taking—that produces competitive disparities in the national marketplace . . . .

*Id.* at 12, U.S.Code Cong. & Admin.News 1978, p. 1432.[16]

> Well, you're getting a little ahead of me. I was going to ask you what the basis was for distinguishing between agencies and branches and, sharing your views about the desirability of parity between foreign and domestic institutions, ask if the Treasury would have objections to permitting agencies and branches to engage in such multistate activities as the States are willing to permit, except that their deposit taking activities, outside of their home State, would be limited to those of Edge Act corporations.

*International Banking Act of 1978: Hearings on H.R. 10899 before the Subcomm. on Financial Institutions of the Senate Comm. on Banking, Housing, and Urban Affairs,* 95th Cong., 2d Sess. 72 (1978). Based on an excerpt of this question, appellants argue that Senator Stevenson's remarks "provide overwhelming evidence that the Comptroller may not approve either the establishment or the business operations of an interstate federal branch or agency unless they are expressly permitted by the state in which such office is to be located." Brief of Appellants at 51. We are not convinced that Senator Stevenson intended his words as a statement that section 5(a) empowered the receiving state to impose its operating limitations

**16.** Appellants also note the comments by Congressmen Annunzio, Pepper, and Fascell during the House floor debate on the IBA. *See* 124 Cong.Rec. 9080–104 (1978). These comments indicated the Congressmen's approval of state limitations on interstate branches and agencies. However, the Congressmen were speaking in opposition to a committee amendment to section 5(a), later rejected by the House (*see id.* at 9100), that would have required a receiving state to permit the establishment of interstate branches by the state-chartered domestic banks of a particular home state if the receiving state permitted the establishment of interstate branches by the state-chartered foreign banks of that home state. *See id.* at 9090. In each instance the Congressmen's remarks were directed at interstate branching by *state*-chartered foreign and domestic banks. *See id.* at 9094, 9096. Thus, these comments have little significance in determining a state's power over the *federally*-chartered interstate offices of a foreign bank under the IBA's section 5(a).

Appellants also direct our attention to a question Senator Stevenson asked Robert H. Mundheim, the General Counsel to the Department of the Treasury, during Senate hearings on the IBA. Senator Stevenson asked:

The District Court upheld the Comptroller's regulations. It said:

Notwithstanding plaintiffs' suggestion that the difference between the language in sections 5(a)(1) and (3) and that in section 5(a)(2) is only semantic, the Court cannot ignore as explicit a distinction as that which the draftsmen drew here. A federal branch or agency will not be allowed unless "its operation is expressly permitted by the State in which it is to be operated;" a State branch will not be permitted unless "it is approved by the bank regulatory authority of the State in which such branch is to be operated." See Pub.L. No. 95–369 § 5(a), 92 Stat. 613. In light of the system for dual entry into the United States market, through either State chartering or the federal provisions of section 4(a) of the Act, the conclusion that Congress intended not to subject federal interstate offices to the particular requirements of State law is inescapable. As the 1978 Senate Report observed, section 5(a) "affirms in Federal law the right of the States to attract foreign banks and foreign investment by allowing foreign bank branches and agencies to be established in any State where permissible. . . . The section leaves each State free to decide whether and to what extent it wishes to permit foreign banks [. . .]." 1978 Senate Report at 10–12. The States were left free by section 5(a) to allow agencies, branches, both agencies and branches, or neither. And nothing in the Comptroller's regulations would deny them that power: States may veto any foreign bank entry into their territories and may limit operations to branch or agency activities. Section 5(a), and the Comptroller's regulations, only leave federal authorities free to grant charters in those States where the type of operation on foreign banks' federally-chartered interstate offices. Regardless of the proper characterization of Senator Stevenson's words, however, we find this part of the IBA's legislative history inconclusive in determining the section 5(a) issue.

**17.** We also reject appellants' argument grounded on similarities between the Douglas Amend-

the foreign applicant seeks is not itself prohibited.

J.A. 104 (unbracketed ellipsis in original).

### B

■ We agree with the District Court's conclusion on this issue. After closely reviewing the language and legislative history of section 5(a) in the light of appellants' arguments, we cannot say that there are "compelling indications" that the Comptroller's interpretation of section 5(a) is wrong.[17] See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). Thus, we are obliged to defer to the Comptroller's interpretation of the IBA because "the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." Blum v. Bacon, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982). See also FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

Section 5(a) provides in relevant part that "no foreign bank may . . . establish and operate a Federal branch [or agency] outside of its home State unless (A) its operation is expressly permitted by the State in which it is to be operated . . . ." 12 U.S.C. § 3103(a)(1), (3) (Supp. V 1981). The dispute in interpreting this section focuses on the words "its operation." The appellants conclude that "its operation" refers to the operation of a particular federal interstate office. Thus, in appellants' view, section 5(a) would prohibit the Comptroller from licensing a federal interstate office if, due to limitations on banking operations or due to banking reciprocity requirements, the receiving state did not expressly permit the "operation" of that federal interstate office.

ment, see supra pp. 17–18, and the IBA's section 5. We are not willing to reject the Comptroller's view of section 5 based solely on comparisons to an unrelated, though similarly worded statute when the Comptroller has chosen a course that is consistent with the language and legislative history of section 5(a).

On the other hand, the Comptroller concludes that "its operation" refers only to the interstate office's operation as a branch or as an agency. The Comptroller says that section 5(a) prohibits him from licensing an interstate branch (or agency) unless the receiving state expressly permits foreign banks to operate branches (or agencies). We believe that the language of section 5(a) reasonably supports either party's interpretation of the words "its operation." In addition, unlike the District Court, we do not believe that the precise difference between "expressly permitted" in sections 5(a)(1)(A) and 5(a)(3) and "approved" in sections 5(a)(2)(A) and 5(a)(4) is evident in the language of the statute.

Faced with two arguably reasonable interpretations of one statutory provision, we turn to the legislative history for guidance. Unfortunately, the relevant legislative history does not favor one interpretation over the other. The Senate Report says a foreign bank could "establish branch or agency offices in any State *where this is permissible*," and "foreign bank branches and agencies would be able, *with appropriate State approval* where necessary, to make both domestic and international commerical [sic] loans at locations throughout the country," and that section 5 allows states "to decide whether *and to what extent* it wishes to permit foreign banks." *1978 Senate Report, supra,* at 10–12, U.S.Code Cong. & Admin.News 1978, pp. 1430–1432 (emphasis added). These general statements are consistent with the interpretation of either party in this appeal.

In short, we do not discern from the language or legislative history of section 5(a) any basis for saying that the Comptroller's interpretation is contrary to law.[18] In so doing, we bear in mind that our task is not to interpret the statute as we think best but rather to determine whether the Comptroller's interpretation was "'sufficiently reasonable' to be accepted by a reviewing court." *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). "To satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id. See also Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). We hold, therefore, that the Comptroller can license a foreign bank's federal interstate branch in a receiving state if that state permits foreign banks to establish state-chartered interstate branches. Likewise, he can license a foreign bank's federal interstate agency in a receiving state if that state permits foreign banks to establish state-chartered interstate agencies. We also agree with the Comptroller that section 5(a) does not require federal interstate offices to comply with limitations on bank operations imposed by the receiving state.

### IV

We now turn to the question whether a federal agency of a foreign bank can accept deposits from a person who is neither a citizen nor a resident of the United States. The Comptroller promulgated a regulation which stated that a federal agency could not accept deposits from citizens or residents of the United States. *See* 12 C.F.R. § 28.2(b) (1980).[19] However, in responding to public comments on this regulation, the Comptroller stated that "foreign-source deposits may be accepted by Federal agencies." 44 Fed.Reg. 65382 (1979). Appel-

18. It would be inappropriate to resolve this dispute over section 5(a) by reference to the IBA's general theme of national treatment because the Comptroller cannot license interstate branches for domestic national banks and, therefore, section 5(a)'s authorization of federal interstate offices for foreign banks has no domestic counterpart.

19. 12 C.F.R. § 28.2(b) (1980) provides:

A "Federal agency" is an office or place of business, licensed by the Comptroller and operated by a foreign bank in any State of the United States, which can engage in the business of banking but cannot exercise fiduciary powers or accept deposits from citizens or residents of the United States. A Federal agency may, however, maintain credit balances.

lants challenge this interpretation of the IBA.

## A

Under the IBA, an "agency" is defined in section 1(b)(1) as:

> any office or any place of business of a foreign bank located in any State of the United States at which credit balances are maintained incidental to or arising out of the exercise of banking powers, checks are paid, or money is lent but at which deposits may not be accepted from citizens or residents of the United States ....[20]

12 U.S.C. § 3101(1) (Supp. V 1981). Section 1(b)(5), however, defines "Federal agency" as "an agency of a foreign bank established and operating under section [4] of this [Act]", *id.* § 3101(5), and section 4(d)[21] states that "[n]otwithstanding any other provision of this section, a foreign bank shall not receive deposits ... at any Federal agency." *Id.* § 3102(d).

Appellants contend that regulation 28.-2(b) violates section 4(d) of the IBA because, as indicated by the Comptroller's response to the applicable public comments, regulation 28.2(b) allows a federal agency to accept deposits. They argue that section 1(b)(1) is only a general definition of "agency" and that section 1(b)(5) subjects a *federal* agency to the additional limitations of section 4(d). Brief of Appellants at 59–60.

The Comptroller says that the validity of regulation 28.2(b) must be decided in the light of all the IBA provisions that are relevant to federal agency depository powers; section 4(d), he says, should not be considered in isolation. Following this approach, the Comptroller asserts that the "key distinction" between "branches" in section 1(b)(3)[22] and "agencies" in section 1(b)(1) is that branches can accept any deposits and agencies cannot accept deposits from United States citizens or residents. In the Comptroller's view, this distinction applies throughout the IBA and should be effected in interpreting section 4(d). Brief for Appellee at 47–48. *See* 44 Fed.Reg. 65382 (1979). The Comptroller next observes that section 4(b), 12 U.S.C. § 3102(b) (Supp. V 1981), grants to a foreign bank's federal branches and agencies the same rights and privileges as a national bank doing business at the same location. In the Comptroller's view, Congress included the section 4(d) limitation on a federal agency's deposit taking power to make clear that section 4(b) did not empower federal agencies to receive domestic deposits. In particular, he notes that section 4(d) begins "Notwithstanding any other provision of this section : ...." (*i.e.*, section 4 and not the entire Act), and concludes from this language that section 4(d) was not intended to limit section 1(b)(1). Brief for Appellee at 48–49. Thus, the Comptroller would have us read section 4(d)'s prohibition against federal agencies accepting "deposits" as a prohibition against federal agencies accepting "domestic-source deposits." Finally, the Comptroller emphasizes that as the official charged with administration of the federal branch and agency provisions of the IBA, his interpretation of the IBA is entitled to great deference by the courts.

The Comptroller contends that the legislative history of the IBA supports his inter-

---

**20.** 12 C.F.R. § 28.2(a) (1980) provides:

"Credit balances", as distinct from deposits, consist of funds received at a Federal agency incidental to or arising out of the exercise of banking powers that are not intended to be deposits and that do not remain in the receiving institution after the transaction(s) to which they relate is completed.

This definition is not in dispute in this case.

**21.** Section 4(d), 12 U.S.C. § 3102(d) (Supp. V 1981), provides:

Notwithstanding any other provision of this section, a foreign bank shall not receive de-

posits or exercise fiduciary powers at any Federal agency. A foreign bank may, however, maintain at a Federal agency for the account of others credit balances incidental to, or arising out of, the exercise of its lawful powers.

**22.** Section 1(b)(3), 12 U.S.C. § 3101(3) (Supp. V 1981), provides:

"branch" means any office or any place of business of a foreign bank located in any State of the United States at which deposits are received....

pretation of sections 1 and 4. He first points to a May 29, 1975 press release from Congressman Rees, who introduced H.R. 12103, *supra.* That bill was the first foreign banking bill to define "agency." Congressman Rees stated that the "key difference between foreign [bank] branches and agencies currently is that branches can accept deposits from U.S. residents while agencies cannot." Brief for Appellee at 50. H.R. 12103 died in committee. The Comptroller next points to H.R. 13876, *supra,* sections 1(b)(1) and 4(d) of which were nearly identical to the like numbered sections of the IBA. In commenting on H.R. 13876, Congressman St. Germain noted, "The present legislation will allow foreign banks to establish agencies in more than one State since agencies cannot accept domestic deposits." 122 Cong.Rec. 24403 (1976). H.R. 13876 passed the House, but died in committee in the Senate. The Comptroller acknowledges that the Senate Report accompanying H.R. 10899, which became the IBA, stated simply that "agencies cannot accept deposits." *1978 Senate Report, supra,* at 3. But he argues that Congress, in considering H.R. 10899, was greatly concerned with the extent to which a foreign bank's interstate branches could accept domestic deposits under section 5. The Comptroller asserts that due to this emphasis on domestic deposits, "[e]ventually, the Congress came to view the acceptance by agencies of non-U.S. deposits as synonymous with the acceptance of no deposits for purposes of the Act." Brief for Appellee at 51. The Comptroller concludes from this legislative history that Congress intended one crucial difference between branches and agencies—a branch, unlike an agency, can accept domestic deposits. The Comptroller also argues that the policies and objectives of the IBA support his conclusion. He says that denying federal agencies the power to accept foreign source deposits would diminish the intended parity of treatment between foreign and domestic banks, would eliminate a benefit intended to offset the detriment to foreign banks of other IBA provisions, and would curtail the influx of foreign funds into this country.

Appellants respond that H.R. 12103 would not have empowered the Comptroller to license a federal agency of a foreign bank. Thus, Congressman Rees' press release and H.R. 12103 itself referred solely to state-chartered agencies, and Congressman Rees' view of the differences between state-chartered branches and agencies under H.R. 12103 sheds no light on the differences between federally-chartered branches and agencies under the IBA. Reply Brief of Appellants at 31. Appellants note that H.R. 13876, the first bill introduced that would have permitted the Comptroller to charter federal foreign bank agencies, provided, in its section 4(d), that "a foreign bank shall not engage in the business of receiving deposits ... at any Federal agency." Thus, appellants argue, as soon as Congress empowered the Comptroller to license federal agencies, it prohibited federal agencies from accepting any deposits, and Congress intended the same prohibition in section 4(d) of the IBA. To support their view of H.R. 13876, they point to the committee report accompanying that bill and submit that the report indicates that a federal agency could not accept any deposits under that bill. The report, also cited by the Comptroller, stated:

> The home state of a foreign bank is defined as the state in which it accepts deposits. If it does not accept deposits, that is, if it has no branches or banking subsidiary and its activities are limited to operations permissible for agencies and commercial lending companies, then it may choose its home state from among those in which it conducts such operations. The intent is to restrict the acceptance of deposits to one state.

H.R.Rep. No. 1193, *supra,* at 4. The appellants say that we should not accord any importance to Congressman St. Germain's statement during the debate on H.R. 13876, because during the debate on the IBA, Congressman St. Germain stated without qualification that an agency could not accept deposits. 124 Cong.Rec. 9097 & 9098 (1978).

The District Court upheld the Comptroller's regulation. It found:

Given the ambiguity of the statute and the confused and scant legislative history, the Comptroller's view of section 4(d) seems not unreasonable. Section 4(b), it should be noted, flatly granted federal agencies and branches of foreign banks "the same rights and privileges as a national bank" in the home State, with some exceptions. It is clear that the Act's sponsors did not intend to permit acceptance of domestic deposits by federal agencies as well as by federal branches. It may well be that the only function of the controverted language of section 4(d) was thus to withdraw whatever authority the Comptroller might appear to have gained under section 4(b) to authorize acceptance of domestic deposits at federal agencies. Such a view is supported by the first words of section 4(d), which establish that section 4(d) has effect "[n]otwithstanding any other provision of this section [*i.e.*, section 4]." If plaintiffs were correct in their view, then careful drafting of section 4(d) would have extended the "notwithstanding" preface in section 4(d) not just to section 4 itself but to the whole Act, to avoid the confusion created if the definition in section 1(b)(1) were read with section 4(d). The Court therefore concludes that the Comptroller properly read sections 1(b)(1) and 4(d) together when he promulgated regulations that permit federal agencies to accept foreign-source deposits. 12 C.F.R. § 28.2(b) (1981) . . . .

Moreover, absent "compelling indications" that the Comptroller's interpretation is wrong, the Court is obliged not to overturn it. . . . And the Court cannot say, based upon the terms of sections 1(b)(1), 1(b)(5) and 4(d), and the legislative history, that the statute specifically precludes the Comptroller's interpretation

or that there is no basis in the legislative history for what he has done.

J.A. 107–08 (citations omitted).

## B

■ We believe the District Court deferred to the Comptroller when no deference was due.[23] The language of section 4(d) is not ambiguous. In section 1(b)(1) Congress provided that no agency of a foreign bank, whether operating under a federal or state charter, could accept deposits from citizens or residents of the United States. Section 1(b)(5), however, requires a federal agency be established under section 4, and in section 4(d), Congress prohibited federal agencies from accepting any deposits. The legislative history supports this plain meaning interpretation of the statute. For example, the House Report accompanying the IBA stated, in commenting on section 4: "Agencies . . . could perform all the functions of branches except for the receipt of deposits and the exercise of fiduciary powers." *1978 House Report, supra,* at 12. The Senate Report states flatly, "Federal agencies cannot accept deposits . . . ." *1978 Senate Report, supra,* at 7. *See also id.* at 10. This clear statutory mandate cannot be overcome by generalized policy arguments or scattered citations to the legislative history of unenacted bills. We therefore reject the Comptroller's interpretation of sections 1 and 4.

Despite the Comptroller's assertion to the contrary, section 4(d)'s prohibition against federal agencies' accepting deposits was *not* necessary in order to prevent a possible inference that section 4(b) granted federal agencies the power to accept deposits on the same terms as national banks. By its own terms, Section 4(b) only applies "[e]xcept as otherwise specifically provided" in the IBA.

**23.** In *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968), the Supreme Court stated:

The construction put on a statute by the agency charged with administering it is entitled to deference by the courts, and ordinarily that construction will be affirmed if it has a "reasonable basis in law." But the courts are the final authorities on issues of statutory

construction and "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 [ (1965) ].

*Id.* at 272, 88 S.Ct. at 935 (citations omitted).

If section 1(b)(1) controls agency deposit-taking powers, as the Comptroller maintains, the quoted proviso in section 4(b) would invoke section 1(b)(1) and would prevent section 4(b) from granting federal agencies deposit-taking powers equal to those of national banks. Thus, adoption of the Comptroller's interpretation would render section 4(d)'s prohibition against federal agencies' accepting deposits mere surplus language in the statute. But in construing a statute, we "are obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). *See also Symons v. Chrysler Corp. Loan Guarantee Board*, 216 U.S.App.D.C. 80, 83–84, 670 F.2d 238, 241–42 (1981). By following the plain meaning of sections 1 and 4 we fulfill our obligation to give effect to each relevant provision of the IBA.

Thus, we reverse the District Court's approval of regulation 28.2(b), and conclude that the plain language of sections 1 and 4(d) prohibits a foreign bank's federally-chartered agency from receiving deposits from any source.

### V

We affirm the District Court as to the Comptroller's interpretations of sections 4(a) and 5(a) of the IBA. However, the District Court erred in approving the Comptroller's interpretation of sections 1 and 4(d) and, to that extent, we reverse.

*So ordered.*